**UNITED STATES of America,**

v.

**Leticia A. CHECOURA, Defendant.**

**No. CR.A. 01–149.**

United States District Court,
D. New Jersey.

Dec. 7, 2001.

Robert J. Cleary, United States Attorney, Howard Wiener, Assistant United States Attorney, Camden, NJ, Attorneys for the United States of America.

Richard Coughlin, Federal Public Defender, Lori M. Koch, Assistant Federal Public Defender, Camden, NJ, Attorneys for Defendant, Leticia A. Checoura.

## OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

This case requires me to explore new territory created by a 1998 amendment to the United States Sentencing Guidelines encouraging downward departures for significant impairment of a defendant's "volitional" capacities—that is, his or her power to resist the temptation to do wrong. On March 2, 2001, the Defendant, Leticia A. Checoura ("Checoura"), pled guilty to an information charging her with interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. Checoura has now moved for a downward departure from the applicable sentencing guideline range based on her diminished mental capacity. Because I find that Checoura's compulsive gambling disorder significantly impaired her ability to control her wrongful behavior, I will grant her motion for a downward departure and depart downward from a Total Offense Level of 20 to 18. Thus, with a Criminal History Category of I, I find the Sentencing Guideline range to be 27–33 months.

## II. FACTS AND PROCEDURAL HISTORY

### A. The Guidelines Calculation

The Government's Information alleges, and Checoura agrees, that from 1993 through 1998, Checoura utilized her position as a bookkeeper for her employer, S & S X–Ray Products, to divert over $4 million dollars from the firm to her own personal use. The parties agree that the base offense level is 4, and that, as the amount of loss is between $2.5 and $5 million, there is an upward adjustment of 15 levels. U.S.S.G. § 2B1.1(b)(1)(P). The parties also agree that two levels should be added for more than minimal planning, pursuant to U.S.S.G. § 2B1.1(b)(4)(A). The Probation Office additionally recommended, and the parties did not object to, another two-level adjustment for abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3. I agree that the record at sentencing supports these recommendations. Checoura is also entitled to a three-level downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a), (b). Thus, the Total Offense Level is 20. Therefore, absent a downward departure, with a criminal history category of I, Checoura's Sentencing Guideline range is 33–41 months.

### B. The Motion for A Downward Departure

In her plea agreement, Checoura preserved her right to argue to this Court that her wrongdoing was at least in part the result of a diminished mental capacity, such that she is eligible for a downward departure, pursuant to U.S.S.G. § 5K2.13.[1] In support of her argument, Checoura presented a written patient evaluation from Dr. Valerie C. Lorenz, ("Lorenz" or "Dr. Lorenz"), the Executive Director of the Compulsive Gambling Center and a Certified Clinical Mental Health Counselor.

---

1. Section 5K2.13, a policy statement, provides that:

   A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incar-

The Government opposed Checoura's motion.

On September 23, 2001, Checoura appeared for her sentencing hearing. At the hearing, Lorenz testified on behalf of Checoura, and was also cross-examined by the Government. At the conclusion of the hearing, I took the Motion for a Downward Departure under advisement, directing Checoura and the Government to provide supplemental briefing on the question whether, in light of Dr. Lorenz's testimony, Checoura should be granted a downward departure.

The essence of Dr. Lorenz's testimony was that Checoura is afflicted with a serious pathological gambling disorder that, when active, drives her to do anything possible to obtain money to indulge her gambling habit. The disorder, Dr. Lorenz testified, is probably a product of Checoura's severe depression and post-traumatic stress disorder, an attempt by her mind to block out a troubled past that includes multiple major illnesses, sexual molestation, and emotional and physical abuse by a spouse whose beatings nearly killed or paralyzed her. Tr. 24–29. At the peak of her gambling activities, Checoura was wagering more than $100,000 per month. PSR ¶ 19. In Dr. Lorenz's opinion, it was the need to subsidize her vast betting losses that "directly and substantially" led Checoura to begin stealing money from her employers. Tr. Exh. D–2 at 1.

## III. DISCUSSION

### A. This Court Has the Power to Depart Downward Pursuant to Section 5K2.13

Departures for diminished mental capacity are encouraged by the Sentencing Guidelines. There is no serious doubt that failures of will, as well as of understanding, are embraced by § 5K2.13. *See* U.S.S.G. § 5K2.13, comment. (n.1) (2000); *United States v. McBroom,* 124 F.3d 533, 546 (3d Cir.1997). I must at least pause, however, to consider whether my authority to depart downward based on diminished capacity requires a "direct" causal connection between the disorder and the criminal conduct at issue. In other words, can a defendant who is accused, not of unlawful gambling, but of theft, claim that an irresistable compulsion to gamble caused him or her to commit the theft?

I agree with those courts that have held that an indirect causal relation between the disorder and the crime is sufficient to bring the defendant within the purview of § 5K2.13. *See United States v. Sadolsky,* 234 F.3d 938, 942–43 (6th Cir.2000); *United States v. Roach,* No. 00 CR 411, 2001 WL 664438, at *3 (N.D.Ill. June 4, 2001). Even if I were not persuaded by the textual and policy arguments offered by the Sixth Circuit, I believe that the matter is not an open question in the Third Circuit. The *McBroom* court, in determining that "mental capacity" as it was used in § 5K2.13 included a volitional component, expressly relied on its earlier opinions construing the scope of the insanity defense prior to the passage of the Insanity Defense Reform Act of 1984, Pub.L. No. 98–473, Title II, § 402(a), 98 Stat. 2057, § 20, *recodified at* 18 U.S.C. § 17. *See McBroom,* 124 F.3d at 544–46. Under the old regime, it was irrelevant whether the defendant's compulsion was to commit the acts constituting the crime or to undertake

---

cerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

some other activity to which the crime was a necessary incident. *See United States v. Currens,* 290 F.2d 751, 774–75 (3d Cir. 1961); *see also Bethea v. United States,* 365 A.2d 64, 81 n. 37 (D.C.1976) (explaining *Currens* standard as requiring only "a demonstrable relationship between the mental disease or defect and the condemned behavior"), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); *cf. United States v. Austin,* 533 F.2d 879, 888–89 (3d Cir.1976) (Adams, J., dissenting) (arguing that erroneous instruction was not harmless when it could have permitted jury to conclude that defendant was not legally insane, even though his decision to rob bank was motivated by paranoid delusions), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 746, 50 L.Ed.2d 756 (1977). *But cf. United States v. Torniero,* 735 F.2d 725, 730–35 (2d Cir.1984) (rejecting gambling addiction as basis for insanity defense because there was no "volitional nexus between gambling and stealing"), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 782 (1985). Since the *Currens* "rationale .... remains viable ... in the sentencing phase" under § 5K2.13, *McBroom,* 124 F.3d at 546, and the Third Circuit has previously deemed that rationale to demand consideration of any incapacity causally related to the criminal acts of which the defendant stands accused, I am not free to limit § 5K2.13 only to incidents "directly" caused by a mental incapacity, whatever "direct" may mean.

## B. Evidence of Significantly Reduced Mental Capacity

■ Most of Checoura's evidence of her reduced mental capacity consists of the testimony of Dr. Lorenz. Dr. Lorenz testified that, in her professional view, Checoura is a compulsive, or pathological, gambler.[2] Tr. at 21. Pathological gambling is a recognized mental disorder. *Id.* at 18. Lorenz based her diagnosis on two full days of diagnostic examination, including extensive questioning and a battery of psychological testing. *Id.* at 20–23. These tests are designed in part to detect patients who may be malingering. *Id.* at 31. Lorenz also explained a number of traumatic incidents in Checoura's life, *id.* at 24–27, 29, which, in Lorenz's opinion, were responsible for the underlying depression, guilt, and posttraumatic stress disorder that precipitated the gambling disorder. *Id.* at 24.

As a result of Checoura's disorder, Lorenz testified, Checoura was not able to control her gambling activity or "anything related to the gambling." *Id.* at 29. As with other pathological gamblers, Checoura may have had moments in which she recognized that she "shouldn't be doing it," but to act otherwise would have been "very torturous." *Id.* at 30. Checoura's capacity to resist the urge to gamble, in Lorenz's opinion, was lower than in the numerous other patients she had evaluated over the years at her facility. *Id.* at 31.

Dr. Lorenz's testimony was more than sufficient to establish that Checoura had significantly less capacity to resist her gambling-related urges than the ordinary person, or, indeed, the ordinary pathological gambler. I found Dr. Lorenz to be a credible and highly knowledgeable expert witness. Accordingly, Checoura has met her burden to demonstrate that she suffered from a significantly reduced mental capacity. Therefore, I conclude that I have the authority to depart downwardly

---

**2.** "Pathological gambling is the correct clinical term, [while] compulsive gambling is more of the layman's term." Tr. at 18.

pursuant to § 5K2.13.[3]

## C. A Downward Departure is Appropriate Under the Circumstances

■ The Government advances a pair of policy arguments in support of its contention that, even if I have the power to grant Checoura's Motion for a Downward Departure, I should decline to do so. However, both of the arguments advanced by the Government are at least somewhat inconsistent with the general purpose of § 5K2.13, and I find them unpersuasive in this case.

The Government first contends that, as compulsive gambling is an addictive behavior much like drug or alcohol abuse, it should not serve as a basis for departure. Section 5K2.13 expressly excludes mental incapacity that results from "voluntary use of drugs or other intoxicants." A stronger version of this argument might add that it is probably inconsistent with the Guidelines' goal of promoting equal treatment of similar defendants to depart downward for gambling addicts but not for drug or alcohol addicts. Both forms of the argument, however, misconceive the purpose of the "drug or other intoxicant" exception. As Judge Easterbrook has argued, § 5K2.13 allows a court to depart when the power of specific deterrence has little hold over an individual defendant. *See United States v. Poff,* 926 F.2d 588, 595–96 (7th Cir.) (Easterbrook, J., dissenting), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). However, when a person can choose, by voluntary conduct, to put themselves in a state whereby they cannot later resist temptation, there is obviously still a possibility for the law to change the person's behavior. *See id.* Similarly, under

the blameworthiness approach of the Model Penal Code, defendants cannot claim that their intoxication deprived them of the mental capacity to carry out "voluntary" acts; in effect, the intent to become intoxicated is a complete substitute for the intent to commit the later crime. *See* American Law Institute, Model Penal Code § 2.08 (1985). Significantly, the Code allows an exception where the defendant was *unintentionally* (or, as the Code describes it, "pathologically") intoxicated—for instance, where he or she became greatly intoxicated from a single sip of beer. *See id.* § 2.08(4), (5)(c). Both approaches therefore suggest that the best explanation for the "drug or other intoxicant" exception to § 5K2.13 is not to single out addicts for more severe punishment but rather to assure that those who are mentally incapacitated as a result of prior rational choices are treated as penologically equivalent to those who in fact choose to commit crime. *Cf. Montana v. Egelhoff,* 518 U.S. 37, 50, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality op.) ("[T]he rule [disallowing consideration of voluntary intoxication as an affirmative defense] comports with and implements society's moral perception that one who has voluntarily impaired his own faculties should be responsible for the consequences.").

Viewed in this light, the "drugs or other intoxicants" exception has little bearing on Checoura's downward departure motion. Checoura did not choose to gamble compulsively, any more than other compulsives choose to count every line in a cracked sidewalk, or to wash their hands after touching every doorknob. At worst, Checoura is like the Model Penal Code's "pathologically" intoxicated offender—she

---

3. I note that the Government does not argue, and there is no evidence to suggest, that Checoura committed the offense due to voluntary use of drugs or alcohol, that the offense in- volved actual violence or a serious threat of violence, or that Checoura's criminal history indicates a need to protect the public by in- carcerating her.

chose to begin gambling without any intimation that she would be susceptible to its influence to a "grossly excessive degree." Model Penal Code § 2.08(5)(c). Thus, there is no inequity in treating Checoura unlike those who have voluntarily used drugs, because she is not similarly situated to such individuals in the most crucial respect. *But see United States v. Katzenstein,* No. 90 CR 272(KMW), 1991 WL 24386, at *2 (S.D.N.Y. Feb.20, 1991) (finding "no principled distinction" between compulsive gambling and use of drugs or alcohol).

The Government next argues that, even if § 5K2.13 permits downward departures where the offense conduct was indirectly caused by the defendant's volitional incapacity, the fact that there is only an indirect relation is a reason for this Court to withhold its discretion to depart. At least one other sentencing court has seemingly followed this approach. *See United States v. Carucci,* 33 F.Supp.2d 302, 302–03 (S.D.N.Y.1999). After acknowledging his authority to depart on the theory that Carucci, a compulsive gambler, possessed diminished capacity to exercise self-control, Judge Rakoff refused to do so, noting that "[w]hile defendant's large gambling losses may have sufficiently exceeded his ... income as to create an incentive to engage in lucrative unlawful trading, economic pressure hardly equates with diminished mental capacity." *Id.* at 303. I respectfully disagree.

The basis of my disagreement is essentially linguistic. Carucci's claim that "compulsive gambling" included unlawful trading was rejected because, in Judge Rakoff's view, "gambling" did not include the gathering of funds for gambling. Yet "gambling" is an omnibus term embracing a whole sequence of discrete physical and mental activities. In Judge Rakoff's view, that sequence might begin with the brain's reception of visual stimuli that it recognizes as a "slot machine" and end with the response of his arm to the brain's command that it pull down the arm of the machine. Yet to another mind, the same sequence might begin with the various acts that make up the acquisition of the coins to be dropped into the slot. Thus, the term "compulsive gambler" might describe a person whose ordinary volition disappears only when their hand is actually resting on the arm of the slot machine, or it might describe a person who cannot resist swiping the odd unguarded quarter. Both, in my view, are equally entitled to benefit from § 5K2.13 if the acts that fall within their compulsion prove to be criminal. *Cf. Sadolsky,* 234 F.3d at 943 (noting that a hypothetical defendant with an eating disorder should be entitled to benefit from § 5K2.13 regardless of whether he or she steals bread or money to buy bread). I therefore cannot agree with the Government that the fact that Checoura's theft stood at some causal remove from her compulsion to gamble provides any reason to deny or reduce the extent of a downward departure.

As § 5K2.13 is an encouraged departure, and I have concluded that there is no reason not to depart downwardly, I shall grant Checoura's motion.

### D. The Extent of the Departure

The extent of a departure for diminished capacity "should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. § 5K2.13. Although I have determined that Checoura possessed significantly reduced mental capacity, that is not to say that she is entirely blameless. Low willpower is not no willpower, and the law demands compliance from the strong-willed and weak-willed alike. Moreover, the evidence demonstrates that, with suffi-

cient treatment and guidance, Checoura is capable of resisting her impulses. Had she sought help sooner, she might have averted some of the losses suffered by the victim. To be sure, one of the hallmarks of addictive behavior is denial. Yet Checoura presents no evidence to suggest she was unaware of the wrongfulness of her behavior. Even if her continuing refusal to enter treatment was not actually voluntary, the law could fairly impute some measure of voluntariness by the time her spree had reached its destructive heights. As a rough approximation of her culpability, I would hold Checoura responsible for 10% of the total loss through 1996, and responsible for 25% of the losses after 1997, when the rate of theft nearly doubled. That produces a loss figure of about $935,000, for an upward adjustment of 13, rather than the original 15. See U.S.S.G. § 2B1.1(B)(1). Accordingly, I shall depart downward two levels, to Offense Level 18.

## IV. CONCLUSION

For the reasons set forth above, I shall grant Checoura's Motion for a Downward Departure. The Court will enter an appropriate form of Order.

### ORDER

This matter having come before the Court on the Motion of Defendant, Leticia A. Checoura, for a Downward Departure, pursuant to U.S.S.G. § 5K2.13, Richard Coughlin, Esq., Federal Public Defender, Lori M. Koch, Esq., Assistant Federal Public Defender, appearing on behalf of Defendant, Leticia A. Checoura, and Robert J. Cleary, Esq., United States Attorney, Howard Wiener, Esq., Assistant United States Attorney, appearing on behalf of the United States of America; and,

The Court having considered the papers submitted by counsel for Defendant in support of the motion and the papers submitted by counsel for the United States of America in opposition, as well as the Presentence Report and the evidence presented at the sentencing hearing;

For the reasons stated in the Opinion filed concurrently with this Order, IT IS, on this 7th day of December, 2001, hereby ORDERED that:

1. The Motion of Defendant, Leticia A. Checoura, for a Downward Departure, pursuant to U.S.S.G. § 5K2.13 is GRANTED; and,

2. The Court shall depart downward two levels, to a Total Offense Level of 18.