

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-29-2009

# USA v. Anthony Lofink

Precedential or Non-Precedential: Precedential

Docket No. 08-3204

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Anthony Lofink" (2009). *2009 Decisions*. Paper 1419.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1419

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3204
_____

UNITED STATES OF AMERICA,

v.

ANTHONY LOFINK,

Appellant.
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 08-cr-001)
District Judge: Honorable Gregory M. Sleet
_____

Submitted Under Third Circuit LAR 34.1(a)
March 27, 2009

Before:  RENDELL, AMBRO and JORDAN, *Circuit Judges*.

(Filed: April 29, 2009)
_____

Edson A. Bostic
Tieffa N. Harper
Federal Public Defender's Office
District of Delaware
704 King Street - #110
Wilmington, DE   19801
         *Counsel for Appellant*

Christopher J. Burke
David C. Weiss
U.S. Attorney's Office
1007 N. Orange Street - #700
Wilmington, DE   19801
         *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

The United States District Court for the District of Delaware sentenced Defendant Anthony Lofink for his convictions on charges of wire fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering. Lofink had moved for a departure from the Guidelines range contained in the Presentence Investigation Report ("PSR"), but the District Court denied the motion on the basis that it had taken Lofink's arguments into account when fashioning his sentence. Because our precedents require district courts to decide departure motions on their merits in order to satisfy the

2

requirement of procedural reasonableness, we will vacate the sentence and remand for resentencing. In doing so, however, we intimate no opinion as to the merits of Lofink's departure motion or the substantive reasonableness of the sentence the District Court imposed.

## I.

### A.

Lofink was employed as a claims processor for the State of Delaware's Bureau of Unclaimed Property (the "Bureau"). The Bureau is responsible for overseeing the transfer of unclaimed property to the State through the legal process of escheat.[1] Delaware law also allows former owners of escheated property to file a claim for recovery with the Bureau for the value of that property. Del. Code Ann. tit. 12, §§ 1143, 1146.

As a claims processor, Lofink had a number of formal responsibilities. He sent claim forms to potential claimants after they had contacted the Bureau, and he ensured that the forms, when returned, were properly completed, notarized, and accompanied by supporting documentation. Although he had authority to approve claims for property valued at up to

---

[1]Information on Delaware's escheat law and procedures is published electronically at http://revenue.delaware.gov/information/Escheat.shtml (last visited March 3, 2009).

$1,000, larger claims were supposed to require two additional levels of review.[2] Once claims were approved, Lofink would prepare payment vouchers. Such vouchers were typically approved by the Director or Assistant Director of the Division of Revenue, and then the Office of the State Treasurer would prepare checks in amounts corresponding to the approved claims. The Bureau would receive the checks, and Lofink was responsible for their distribution. In practice, Lofink's supervisors entrusted him with managerial discretion, and their review of the claims and supporting documents was limited.

Between May 2005 and July 2007, Lofink fraudulently processed and shared in the proceeds of nine false claims, ranging in value from approximately $20,000 to $200,000 and totaling $1,245,247.53.[3] These claims, submitted by Lofink's co-conspirators,[4] included false representations that the

---

[2] See n.20, *infra*.

[3] An additional false claim for approximately $350,000 was prepared but never submitted to the Bureau and was discovered at Lofink's residence pursuant to a search warrant.

[4] Lofink's co-conspirators all pled guilty to various charges related to the fraud. *See United States v. Smith*, No. 08-18-GMS (D. Del. Sept. 11, 2008) (judgment); *United States v. Roussos*, No. 08-16-GMS (D. Del. Sept. 8, 2008) (judgment), *appeal docketed*, No. 08-3891 (3d Cir. Sept. 22, 2008); *United States v. Davis*, No. 08-15-GMS (D. Del. July 21,

claimants were owners of stock in predecessors of Time Warner, Inc. To ensure the claims' success, Lofink would forge letters from Time Warner, using as a model a genuine letter submitted to the Bureau from Time Warner, indicating that Time Warner had documentation to support the claim. Lofink would also log on to the State's computer database using his supervisors' passwords (at least one of which was, conveniently, "password") to record claim approvals without their knowledge.

Lofink and his co-conspirators made some effort to structure their financial transactions to avoid detection of the fraud, but his purchases were hardly discrete. With his ill-gotten gain, Lofink bought drugs, expensive cars, jewelry, clothing, and cosmetic procedures, and he entered into an agreement with one of his co-conspirators to open a tanning salon in New Castle, Delaware.

Investigators eventually caught on to Lofink's scheme,[5] and he was charged with wire fraud in violation of

---

2008) (judgment), *aff'd*, No. 08-3271, 2009 WL 679336 (3d Cir. March 17, 2009); *United States v. Sanassie*, No. 08-17-GMS (D. Del. Oct. 14, 2008) (judgment), *appeal docketed*, No. 08-4282 (3d Cir. Oct. 27, 2008).

[5]The government's brief states that Lofink was apprehended after the Bureau received an anonymous tip that identified a false claimant by name. The record submitted to

18 U.S.C. § 1343, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956. Pursuant to a plea agreement, Lofink waived indictment and pled guilty to all three counts.

## B.

The Pre-Sentence Report ("PSR") calculated Lofink's base offense level as 23 for his conviction for wire fraud involving a loss of more than $1,000,000 but not more than $2,500,000.[6] *See* U.S.S.G. §§ 2B1.1(a)(1), (b)(1)(I), 2S1.1(a)(1). The PSR then proposed three two-level increases: one because Lofink was also convicted for money laundering, *see* U.S.S.G. § 2S1.1(b)(2)(B); one for his role as an organizer/leader in the criminal activity, *see* § 3B1.1(c); and one for his abuse of a position of trust, *see* § 3B1.3. Lofink received a three-level decrease for his acceptance of responsibility. *See* § 3E1.1. The resulting total offense level of 26, when combined with his criminal history category of I, yielded a sentencing range of 63 to 78 months.

Lofink objected to the position-of-trust enhancement proposed by the PSR, arguing that he only possessed low-

---

us, however, does not disclose how the scheme was discovered.

[6]The PSR calculations are based on the 2007 version of the Guidelines Manual.

level authority to process claims. The District Court overruled that objection, finding that the enhancement was appropriate under the circumstances.

Lofink also moved for a downward departure under § 5K2.13 of the Guidelines. That section allows for a downward departure if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." The Application Note for that section defines "significantly reduced mental capacity" as "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." § 5K2.13, appl. note 1. In his motion, Lofink, who was 30-years old at sentencing, provided a troubling account of his childhood, detailing allegations of verbal and physical abuse by his father against him and his mother. Dr. James Walsh, a mental health counselor who met with Lofink prior to sentencing, opined that the alleged abuse resulted in Lofink's depression, Attention Deficit/Hyperactivity Disorder, and antisocial behavior.

According to Lofink and Dr. Walsh, Lofink initially found a relatively healthy outlet through sports, but he eventually replaced that with alcohol and cocaine. Dr. Walsh suggested that, although sober during most of the conduct at issue in the case, Lofink at some point became a "dry drunk."

7

(D.I. 21,[7] Ex. A at 7.)  Dr. Walsh likened Lofink's condition to a pathological gambling disorder: he craved the emotional and physical "rush" he felt while furthering his illegal conduct.  That rush, Lofink contended, when combined with his prior depression and psychiatric disorders, resulted in a "significantly reduced mental capacity that substantially contributed to the instant offense."  (D.I. 21 at 18.)[8]

At the sentencing hearing, the District Court summarily denied Lofink's departure motion.  Addressing what has become the central problem in this appeal, the Court stated in effect that it was not required to rule on the merits of departure motions.  It noted that its general practice was to consider arguments for a Guidelines departure as part of its evaluation of the sentencing factors set forth in 18 U.S.C. § 3553(a).

_____

[7]Lofink's departure motion is docket item 21 in the District Court, which we refer to as "D.I. 21."

[8]In apparent conflict with the "dry drunk" theory that Lofink was addicted to the thrill of crime, Lofink included in his motion a separate report by a different doctor that concluded that "during the time period that the offenses took place, Mr. Lofink was suffering from alcohol and cocaine abuse and related behavioral problems which served as the underpinning to, and the driving force behind, his behaviors in connection with the offense."  (D.I. 21, Ex. B at 6.)

The Court then heard arguments pursuant to § 3553(a) regarding a variance from the Guidelines range. Lofink's counsel contended that the arguments made in support of a departure also supported a downward variance, as did Lofink's cooperation and acceptance of responsibility. The government countered that a sentence at the low end of the Guidelines range would be appropriate, noting that Lofink's childhood, while difficult in some respects, was not that different from many other defendants'.

Before determining Lofink's sentence, the District Court again explained its process for dealing with departure motions.

> THE COURT: I am mindful of *U.S. v. Gunter*,[9] and, of course, the Third Circuit's three-step approach that we must consider in sentencing and utilize. The Court is calculating the Guideline range, ruling on departure motions and stating how the ruling affects the Guideline calculation and exercising discretion by considering the relevant 3553(a) factors.

> The Court will deny, as I ... already have, again, the defendant's motions, because the Court has taken the defendant's conduct, upbringing, history, addiction, and other circumstances and characteristics into account in considering and

---

[9] 462 F.3d 237 (3d Cir. 2006).

applying the 3553(a) factors to the circumstances of this case.

Although the Court understands that pre-*Booker* case law continues to have advisory force, the Court nevertheless rejects the *Koon*-type analysis[10] as briefed by the parties, because in this Court's view that analysis is inconsistent with the Supreme Court's ruling in *U.S. v. Booker*. As it has stated in the past, this Court finds that conducting this type of analysis effectively eviscerates judges' discretion and shifts sentencing back towards the pre-*Booker* mandatory Guideline regime.

That being said, it bears repeating that the Court has taken all factors raised by the parties into consideration in applying Section 3553(a) to the particular circumstances and characteristics of this particular case and this particular defendant.

(App. at 112-13.)

---

[10]*Compare Koon v. United States*, 518 U.S. 81, 92 (1996) ("A district judge ... must impose on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary one"), *with United States v. Booker*, 543 U.S. 220, 246 (2005) (making the Guidelines system advisory).

The Court ultimately sentenced Lofink to 60 months' imprisonment, three months below the low end of the Guidelines range. The sentence also included three years' supervised release, restitution in the amount of $1,245,247.53, to be paid jointly and severally with his co-conspirators, and forfeiture of property acquired with the stolen funds.

In reaching its sentence, the District Court formally addressed a number of the factors laid out in 18 U.S.C. § 3553(a). The Court noted the complexity of the scheme, Lofink's central role in it, and the increasing dollar amounts involved in each false claim. It also acknowledged Lofink's difficult childhood, but found that he enjoyed advantages and privileges, such as an education at a prestigious private high school and a college scholarship. The Court also recognized that Lofink began cooperating with authorities once the scheme was discovered.

Turning to Dr. Walsh's theory of addiction, the Court found that Lofink retained the understanding of right and wrong and that Lofink's "careful, calculated ... fraud, executed over more than two years and coordinated with others, reflect[ed] focus, premeditation, and self-mastery," all of which undercut his arguments for leniency. (App. at 119-20.) Instead, the Court observed, Lofink "had enough self-control not to gamble too often" and was motivated "by simple greed and a desire for the hundreds of thousands of dollars that [he] acquired to pay for the ... jewelry, the cars, the partying, the cosmetic procedures, [and] the drugs." (App. at 120.) The Court also highlighted Lofink's addiction to drugs and alcohol. It concluded that the factors Lofink relied

11

on to support a reduced sentence did not justify a "substantial reduction." (App. at 121.)

Lofink timely appealed his sentence, arguing that the District Court's analysis was contrary to our precedent.[11] The government concedes that the District Court's treatment of Lofink's departure motion did not comply with our decision in *Gunter*. Nonetheless, it argues that the District Court did not commit reversible error because it engaged in a full discussion of the merits of the departure motion in its analysis of the § 3553(a) factors and clearly substantiated its decision to deny the departure.

## II.

## A.

We employ an abuse-of-discretion standard when reviewing the procedure a district court follows in sentencing a defendant. *Gall v. United States*, -- U.S. --, 128 S.Ct. 586, 597 (2007). We have noted that the standard can have differing consequences, depending on context: for example, we give no deference to legal conclusions and great deference to factual ones. *United States v. Wise*, 515 F.3d 207, 217 (3d Cir. 2008). It is not that our standard of review changes with the issue raised. It is rather the amount of discretion vested in the District Court that varies, based on whether the asserted

---

[11]We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

procedural error is grounded in law or in fact or in some mixture of the two. *Id.* at 217 and n.5. As the government acknowledges, the District Court's decision to deny Lofink's motion to depart was based on a purely legal conclusion, namely that departure motions need not be ruled on if the departure arguments are considered in conjunction with a review of the § 3553(a) sentencing factors. Thus, the District Court's discretion was limited by existing precedents on sentencing procedures.

B.

Prior to the Supreme Court's decision in *Booker*, district courts could depart from a given Guidelines range only when "encouraged" bases for departure were present, as provided by the Guidelines, or in other "'exceptional'" situations. *Koon*, 518 U.S. at 95 (quoting 1995 U.S.S.G. ch. 5, pt. H, intro. comment). Thus, defendants would typically move for departures in the district court with the hope of obtaining a below-Guidelines sentence. *See, e.g.*, *United States v. McBroom*, 124 F.3d 533, 539 (3d Cir. 1997) (acknowledging defendant's motion for downward departure based on significantly reduced mental capacity).

In *Booker*, however, the Supreme Court announced that the Guidelines are advisory only. 543 U.S. at 246. Since then, we have provided district courts with the following three-step process for incorporating adequate consideration of the Guidelines into their sentencing procedures:

(1)     Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

(2)     In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3)     Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors[12] in setting the sentence they

---

[12]The § 3553(a) factors are,

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–
     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
     (B) to afford adequate deterrence to criminal conduct;
     (C) to protect the public from further crimes of the defendant; and
     (D) to provide the defendant with needed educational or vocational training, medical care,

impose regardless whether it varies from the sentence calculated under the Guidelines.

---

or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines–

        (i) issued by the Sentencing Commission ..., subject to any amendments made to such guidelines by act of Congress ...; and

        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement–

    (A) issued by the Sentencing Commission ..., subject to any amendments made to such policy statement by act of Congress ...; and

    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

15

*Gunter*, 462 F.3d at 247 (internal quotation marks and citations omitted). The Supreme Court's recent decision in *United States v. Gall*, -- U.S. --, 128 S.Ct. 586 (2007), cemented the first and third steps in that procedure, *see id.* at 596, and further clarified that a district court must consider all of the § 3553(a) factors.[13] As departure was not an issue in that case, the opinion did not consider the second step. Our precedent, however, clearly requires that district courts engage in the second step—ruling on departure motions—"[a]s a part of calculating the applicable range." *Wise*, 515 F.3d at 216.[14] In *United States v. Jackson* we

---

[13]Although district courts must consider all of the § 3553(a) factors, they need not explicitly comment on every factor if "'the record makes clear the court took the factors into account in sentencing.'" *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008) (quoting *United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006)).

[14]Under our post-*Booker* jurisprudence, we call the altering of a Guidelines range at step two of the sentencing process a "departure." *See United States v. Floyd*, 499 F.3d 308, 311 (3d Cir. 2007). A departure is based on reasons provided by the Guidelines themselves. *United States v. Jackson*, 467 F.3d 834, 837 n.2 (3d Cir. 2006). We call a sentence that diverges from the final Guidelines range—which, because of a departure at step two, may be different from the original Guidelines range—a "variance." *Floyd*, 499 F.3d at 311. A variance is based on the court's consideration of the § 3553(a) factors. *Gunter*, 462 F.3d at 247 n.10. Although we have not

16

highlighted the importance of ruling on departure motions, as called for by *Gunter*'s second step:

> Not for jurisdictional reasons, but rather because the Guidelines still play an integral role in criminal sentencing, ... we require that the entirety of the Guidelines calculation be done correctly, including rulings on Guidelines departures.  Put another way, district courts must still calculate what the proper Guidelines sentencing range is, otherwise the Guidelines cannot be considered properly at *Gunter*'s third step.  The scenario is simple: error entering this sentencing step may presage the sentence ultimately set.

---

required district courts to use these terms, we have noted that their use assists our review.  *See Jackson*, 467 F.3d at 837 n.2.

467F.3d at 838-39 (internal citations and footnote omitted).[15] Indeed, the need to consider all of the § 3553(a) factors, one of which is the applicable Guidelines range, *see* § 3553(a)(4),

[15]In *Jackson* we also noted that six of our sister circuits "essentially employ the same approach to departures as we do," in contrast to the two circuits that have held departure motions to be obsolete in the wake of *Booker*. 467 F.3d at 838 n.5 (collecting cases); *see also United States v. A.B.*, 529 F.3d 1275, 1286 (10th Cir. 2008) (acknowledging that Tenth Circuit caselaw might require the three-step approach). Although the parties do not question our approach, we further observe here that four of those circuits, like us, have indicated that ruling on departure motions is part of correctly calculating the Guidelines range. *See United States v. Wallace*, 461 F.3d 15, 32 (1st Cir. 2006) ("Once the sentencing court has established the GSR (*including a consideration of any applicable departures*), it must then evaluate the sentencing factors set out in 18 U.S.C. § 3553(a) ... .") (quotation omitted); *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006) ("Within this Guideline calculation is the determination of whether a Chapter 5 departure is appropriate."); *United States v. Fuller*, 426 F.3d 556, 562 (2d Cir. 2005) ("[W]e consider here whether the District Court, in calculating the applicable Guidelines sentence, erred in applying a four-level upward departure ... ."); *United States v. Davis*, 478 F.3d 266, 273 (5th Cir. 2007) ("[A] sentence that includes an upward or downward departure as allowed by the Guidelines ... is also a Guidelines sentence ... .") (quotation omitted).

is frustrated when a sentencing court fails to expressly rule on the merits of a departure motion. While it may occasionally occur that an appellate panel can infer that a sentencing court exercised its discretion not to depart—*Jackson* happened to be such a case—we have noted that having to infer what a district court decided is "not our preferred course." 467 F.3d at 840 (quotation omitted).

In *United States v. King*, 454 F.3d 187 (3d Cir. 2006), we faced a situation with some similarities to the present case. The government moved for a five-level upward departure based on severe non-economic harm to the victim under U.S.S.G. § 2F1.1. *Id.* at 190. The district court, stating that it was "'not sure that motions for upward departure [were] relevant in the post[-]*Booker* era,'" did not consider the motion directly but instead considered the arguments in making its final sentence determination.[16] *Id.* at 190. We affirmed the sentence, which was nearly double the top of the Guidelines range, because the record demonstrated that the District Court would have granted the motion to depart upward had it known that it was still obligated to rule on departure motions. *Id.* at 196. We cautioned, however, that there remained a "requirement to 'consider' the Guidelines by calculating a Guidelines sentence as [district courts] would have before *Booker*, including formally ruling on the motions

_____

[16]The district court sentenced the defendant just six weeks after the Supreme Court issued its opinion in *Booker* and so was proceeding without the precedents that have issued in the post-*Booker* period. *Id.* at 196.

19

of both parties and stating on the record whether they are granting a departure and how that departure affects the Guidelines calculation." *Id*.

C.

No one disputes that the District Court here chose to forgo ruling directly on the merits of Lofink's motion for a departure. The Court clearly stated, twice, that it denied Lofink's motion because it had a general practice of not separately considering departure motions. Instead, it had formulated a practice of considering departure arguments while applying the sentencing factors in § 3553(a). The government argues that this case is like *King* because, while the District Court's reason for denial may have been erroneous, its decision to deny was correct. That argument fails for two reasons. Most basically, we were careful to note in *King* that we were reviewing the sentence under a plain error standard. *Id*. at 193. That is simply not the posture of this case. More importantly, *King* was decided at a time when sentencing practices were, in the wake of *Booker*, unavoidably in flux. *King* does not permit district courts to establish sentencing practices that conflict with our now well-established sentencing precedents.

The government also contends that the District Court "simply deferred its discussion of the substantive aspects of Defendant's departure request until Step Three and then fully explained the substantive reasons for denying the motion." (Answering Brief at 31.) There are several difficulties with that argument.

20

First, as a practical matter, a district court's discussion at the variance stage does not necessarily shed light on what it would have done at the departure stage. District courts have greater leeway in deciding what to consider in determining whether to vary from the Guidelines. *See Jackson*, 467 F.3d at 842 n.8 ("'[M]any of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court-with greater latitude-under section 3553(a).'" (quoting *McBride*, 434 F.3d at 476)).[17] By their nature, the Guidelines are highly structured, and the more free-ranging approach permitted at *Gunter*'s Step Three is unlikely to answer all of the questions that must be answered at Step Two.

Second, and a specific example of the general problem just mentioned, even assuming that the District Court here simply deferred its discussion of why it denied Lofink's departure motion, we are unable to determine whether the Court denied the motion because it concluded there was no basis to grant it under § 5K13.2 or because the Court was exercising its discretion. That determination matters because we are not at liberty to review a discretionary denial. *See Jackson*, 467 F.3d at 839 ("[A]s it was pre-*Booker*, courts of

---

[17]The Supreme Court has given wide latitude to district courts to vary from the Guidelines range under § 3553(a), most recently in *Spears v. United States*, -- U.S. --, 129 S.Ct. 840 (2009). But it has not extended that latitude to a district court's procedure for determining the advisory Guidelines range.

21

appeals post-*Booker*[] have no authority to review discretionary denials of departure motions in calculating sentencing ranges."). Unlike in *Jackson*, the government here argued to the District Court that Lofink was not eligible for a reduced mental capacity departure. In *King*, too, there was no question that the ground for an upward departure—the extensive non-economic harm to the victim of the defendant's "identity theft"—was cognizable under the Guidelines. *See* 454 F.3d at 191 (describing harm to include spending over 500 hours protesting charges, changing name on driver's license, contesting unpaid car loans and parking tickets, suffering enduring anxiety, and having difficulty engaging in ordinary commercial transactions). In this case, by contrast, the District Court's basis for denial is unclear. On one hand, the Court noted Lofink's drug and alcohol abuse (App. at 119), which ordinarily would make him ineligible for a § 5K2.13 departure. *See* U.S.S.G. § 5K2.13 ("[T]he court may not depart below the applicable guideline range if ... the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants ... .") On the other hand, the Court decided that Lofink retained his capacity to distinguish right from wrong and the ability to control his actions (App. at 119-20), and further that the issues Lofink advanced in support of a finding of reduced capacity, including his "difficult childhood and struggles with drugs and alcohol[,]" did not justify a substantial reduction (*id.* at 121), all of which may imply a discretionary ruling.[18]

---

[18]We express no opinion as to whether Lofink's condition was of a type that is cognizable as a significantly reduced

22

Third, the government's deferral argument is also suspect because the District Court distinguished the cases on which Lofink relied in his departure motion by referencing the need to avoid unwarranted sentencing disparities, pursuant to § 3553(a)(6). According to the Court, "the sentences in those cases were based on those defendants' distinct circumstances, in some instances many years of public service, or substantively different offenses at issue, or more complete restitution or much smaller amounts of stolen property or funds than the case now before me and the defendant now before me." (App. at 121.) That discussion, while entirely appropriate in the context of § 3553(a)(6), does not tell us what the Court would have done if it had focused on § 5K2.13 when reviewing and ruling on Lofink's arguments for departure.

This, finally, is the most troubling point. If we are to assume, as the government asks, that a departure ruling is implicit in the Step Three discussion by the District Court, we are left to guess how the Court arrived at its sentence. It decided that some aspect of Lofink's case warranted a sentence below the original Guidelines range. Although it indicated that Lofink's departure arguments were undercut by a number of facts and that the arguments did not justify a "substantial reduction," it did not conclude that no reduction was warranted. (App. at 121.) Similarly, although the government emphasizes to us the District Court's statements that Lofink appeared to have maintained self-control and the

mental capacity under § 5K2.13.

23

understanding of right and wrong, the Court also suggested that "substance abuse and addictive personality characteristics" might explain "some of the motivation behind [Lofink's] decision to commit these crimes." (App. at 119.)

Given those statements, as well as the below-Guidelines sentence, it may be that, had the District Court separately ruled on Lofink's departure motion directly, it would have granted the motion and effected it through a minimal reduction to the Guidelines range.[19] We do not suggest that the Court was likely to have done that—it probably was not—and we certainly do not suggest that it should have done that. We note only that, on this record and in the absence of an explicit ruling at Step Two, we do not know whether the defendant had the benefit of the District

---

[19]Section 5K2.13 does not dictate how district courts are to effect a departure, except that "the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." *See*, *e.g.*, *United States v. Checoura*, 176 F. Supp. 2d 310, 315 (D.N.J. 2001) (departing downward only two offense levels on basis of defendant's pathological gambling addiction because defendant was not "entirely blameless"); *United States v. Menyweather*, 447 F.3d 625, 632 (9th Cir. 2006) (affirming eight-level downward departure for, among other things, defendant's "compulsive acquisition behavior"); *cf. Floyd*, 499 F.3d at 312 n.6 (suggesting that "courts have latitude in choosing their methodology" in determining how to effect a departure for substantial assistance under § 5K1.1).

24

Court's consideration of the applicable Guidelines range at the time the Court was fashioning the sentence it imposed. *See* § 3553(a)(4) (requiring sentencing court to consider the Guidelines range).

That deprivation was not harmless. For example, had the court granted a one-level reduction to the offense level, the Guidelines range would have been 57-71 months. Had the government maintained its argument that the § 3553(a) factors suggested a sentence at the low end of the Guidelines range, Lofink might have received a three-month lower sentence without any variance. Had the District Court felt a variance was still warranted, as it seemed to suggest was appropriate due to Lofink's assistance to law enforcement authorities, his sentence might have been lower still.

Of course, Lofink might well have received the same sentence even had the District Court decided the merits of his departure motion at Step Two. But we cannot tell, and thus, despite our respect for the thoughtful consideration the District Court invested in this case, we cannot endorse the procedure it adopted.[20]

---

[20]Lofink also challenges the District Court's decision to apply the two-level sentencing enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3. We will not disturb the Court's decision on that point. Even though Lofink's position only gave him official authority to approve small-dollar claims without further review, Lofink clearly occupied a *de facto* position of trust. *See United States v. Thomas*, 315 F.3d 190,

25

## III.

For the reasons stated, we will vacate the sentence and remand for resentencing.

---

204 (3d Cir. 2002) (determining a position of trust requires looking beyond job title to consider "real scope of [defendant's] job").  The Bureau trusted Lofink to handle claims, including their processing and the evaluation of their merit.  Even as to claims that required additional levels of review, Lofink's supervisors in fact delegated much of the approval responsibility to Lofink and were not likely to closely scrutinize claims.  Lofink's knowledge of the Bureau's procedures allowed him to prepare claims that were almost certain to succeed and, therefore, he had, in practicality, direct access to the funds.  Lofink's ability to maintain his fraudulent scheme for over 30 months and withdraw sums adding up to $1.25 million provides adequate support for the District Court's conclusion that Lofink abused his position of trust in order to commit his crimes.