PRECEDENTIAL

_____

No. 10-2235
_____

UNITED STATES OF AMERICA,

v.

HERMAN FRIEDMAN,
                          Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF NEW JERSEY
_____

(D.C. Crim. Action No. 09-cr-00132)
District Judge: Honorable Anne E. Thompson
_____

Argued on April 25, 2011
_____

Before: SLOVITER and GREENAWAY, JR., Circuit Judges,
and POLLAK, Senior District Judge[*]

_____

[*] Honorable Louis H. Pollak, District Judge of the United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

1

(Opinion Filed: September 28, 2011)

Lawrence S. Lustberg (argued)
Kevin McNulty
Joshua C. Gillette
Gibbons P.C.
One Gateway Center
Newark, NJ 07102
    *Counsel for Appellant*

Caroline A. Sadlowski (argued)
Paul Fishman
United States Attorney
970 Broad Street
Newark, NJ 07102
    *Counsel for Appellee*

_____

OPINION

_____

GREENAWAY, JR., Circuit Judge

Herman Friedman ("Friedman") was convicted of bribery, in violation of 18 U.S.C. § 666(a)(2) and sentenced to 34 months of imprisonment. Friedman argues on appeal that (1) the District Court abused its discretion in rejecting Friedman's proposed jury instruction; (2) the District Court erred in excluding witness testimony; (3) the District Court improperly limited Friedman's cross-examination of certain witnesses; (4) the District Court erred in denying Friedman's motion for mistrial based on violations of Giglio v. United States, 405 U.S. 150 (1972); and (5) Friedman's sentence is

2

procedurally and substantively unreasonable. Friedman appeals the final judgment of conviction and sentence imposed by the District Court on April 26, 2010. For the reasons discussed below, we will affirm the judgment of conviction and remand to the District Court for resentencing.

## I. **BACKGROUND**

Friedman was part owner of an apartment building at 235 56th Street West New York ("WNY"), New Jersey. On March 2, 2007, Building Inspector Silvio Acosta ("Acosta") conducted a routine inspection of the apartment building that Friedman owned and concluded that, in addition to the building's fifteen legal units, it contained a sixteenth illegal unit. On March 27, 2007, Acosta issued a Notice of Violation instructing Friedman to remove the illegal apartment unit. Friedman did not comply and Acosta issued a Municipal Court complaint on May 25, 2007, claiming that Friedman was in violation of § 106.1 of the International Property Maintenance Code.

On or around July 5, 2007, Friedman met with Construction Code Official, Franco Zanardelli ("Zanardelli"). At the time of the meeting, Zanardelli had been cooperating with the Federal Bureau of Investigation ("FBI"), as a result of his June 25, 2007 arrest for bribes he had previously accepted. Zanardelli confirmed that the computerized tax records showed only fifteen legal units in the building and informed Friedman that he needed to either seek a variance from the Board of Adjustment or remove the illegal apartment. Friedman followed Zanardelli's admonition and filled out an "Application for Variance/Denial Letter," the first step in the variance application process. (App. at 1515.) In essence, Friedman claimed that the building contained

3

sixteen rental units when he bought it in 2006 and that there was no indication that the unit was a recent addition.

On July 11, 2007, Friedman appeared in the Municipal Court in response to the complaint. The Municipal Court advised Friedman to work with the town's Building Office to devise a resolution out of court because the violation could accrue a daily penalty of up to $500.

Friedman called Zanardelli on July 12, 2007, urging him to grant a Certificate of Occupancy ("C.O."), without going through the process of the variance. Zanardelli said that "maybe" there was a way to do so and said, "let me look at all the records I have in there. What, what do you want to do? You just want to legalize the unit?" and Friedman responded, "Yes I want to legalize it and take out permits, and just redo it, to make, to make a new unit out of it." (App. at 979-80.) Zanardelli said, "Oh. I don't care. Without going through the, without going through the-"; Friedman interjected and said "Without going through the whole nine yards." (Id. at 980.) Zanardelli replied, "Without going through the nine yards. Uh-huh. Alright, let me see what I can do." (Id.)

The parties disagree as to which documents Zanardelli reviewed. According to Zanardelli's testimony, he requested all tax documents associated with the tax property and reviewed the paper tax file for WNY to confirm the computerized records. He found that, as of 1962, the apartment building was reported to contain fifteen units. Assistant tax assessor Michael Jaeger ("Jaeger") testified at a Federal Rule of Evidence 104 hearing before the District Court that the property record card showed that the building had sixteen physical units, was the most current and accurate

4

record maintained by the Tax Department, and was the record upon which the WNY Building Department relied to determine the number of units in a building. Jaeger could not attest to whether Zanardelli had reviewed this document. Zanardelli testified that he did not review this property record card. According to Friedman, Zanardelli intentionally overlooked the property record card, which indicated that the building had sixteen physical units.

On August 30, 2007, Friedman and Zanardelli met at the apartment building. Friedman said to Zanardelli that the apartment was "existing" and "not something that was created yesterday or a year ago." (Id. at 988.) Zanardelli responded that "[i]t's not on your paperwork and it's not on anything." (Id.) Friedman said, "so you found an existing apartment which wasn't there, you, you put it on. It's not, it's not the first time this happens." (Id.) Zanardelli answered, "No . . . this unit was-wasn't here. Wasn't there" and that "[y]ou're gonna have to go for a variance. That's it. I mean, I mean what are you gonna do." (Id. at 989.) Friedman replied, "Well, you know what you could do, what you can do?" and Zanardelli asked, "So what are you suggesting here?" (Id. 989-990.) Friedman responded with, "You tell me . . . Whatever it is." (Id. at 990.) Zanardelli replied, "I can't tell you, you tell me." (Id.)

Friedman used hand gestures to indicate that Zanardelli should write down a monetary amount; Zanardelli refused to write anything down and Friedman used hand gestures to offer a bribe of $2,000, then $3,000 and ultimately of $5,000. The parties agree that Friedman offered to pay $5,000 to Zanardelli, in lieu of seeking a variance from the zoning board. In return, Zanardelli would issue a C.O. approving the undocumented apartment.

5

After the agreement was brokered, Zanardelli held the violation in abeyance and dismissed the complaint. Zanardelli called Friedman on September 10, 2007, September 13, 2007, and October 18, 2007. Friedman did not return his calls. In November 2007, Zanardelli reinstated the complaint against Friedman, at the direction of the FBI, to pressure Friedman. Zanardelli called Friedman again on February 6, 2008, March 10, 2008, March 14, 2008, and March 24, 2008. Friedman, again, did not respond.

Meanwhile, Friedman placed the building on the market for $1,350,000. In February 2008, he had located a potential buyer, Steven Steiner ("Steiner"), who was willing to pay $1,150,000, but only if the sixteenth apartment was properly approved by the municipality. With the sale in jeopardy, Friedman sent an associate to persuade Zanardelli to issue the C.O. Zanardelli responded that Friedman had two weeks to remove the illegal apartment, seek a variance from the board, or "let him . . . know what he want[s] to do." (Id. at 1011-12.)

On March 25, 2008, Steiner's attorney threatened to abandon the sale unless Friedman was able to deliver the building with sixteen approved units. That same day, almost seven months after Friedman agreed to the bribe, he paid Zanardelli $5,000 in cash and asked that the C.O. be issued immediately. Friedman called Zanardelli numerous times that day to inquire about the C.O., but Zanardelli never issued it. Friedman did not make the sale to Steiner.

On February 26, 2009, Friedman was indicted on one count of bribery, in violation of 18 U.S.C. § 666(a)(2). A jury trial commenced on November 16, 2009. During the trial, the District Court excluded Jaeger's testimony that the property

6

record card showed that the building had sixteen units and was the most current record maintained and used by the WNY Building Department. The District Court excluded the testimony as it was "distracting . . . it's a whimsical argument that this is somehow related to entrapment" and "Mr. Jaeger's testimony doesn't seem to me to be pertinent or relevant because I just don't see any relevance to it, quite frankly." (Id. at 627, 639.)

During trial, the District Court also limited the testimony of Zanardelli and Acosta. The Government's disclosure listed twenty-two properties for which Zanardelli had received money to facilitate building approvals. Zanardelli testified about these bribes during direct examination. During cross-examination, the District Court allowed Friedman to question Zanardelli generally about the twenty-two properties, but did not allow counsel to continue Zanardelli's cross-examination with respect to details about each individual property and bribes solicited once Zanardelli had indicated that he did not remember specific details. The District Court reasoned: "I just want to make sure that we make the best use of our time. Now, to go through every one of those, the point has been made. The details of that is really not this case." (Id. at 373.)

Friedman was permitted to question Zanardelli generally on the bribes and whether he had solicited the bribes or had been approached about the bribes. Zanardelli was asked on cross-examination, "but there were bribes that you solicited, right? That's what you pleaded guilty to." (Id. at 378.) Later, Zanardelli was asked at least three more times: "Were people just coming in and offering you bribes?" (Id. at 386), "Were there times when you solicited bribes and people refused to pay them?" (Id. at 387), and "Were there times

7

when you asked for [bribes] and people refused to pay them?" (Id. at 388).

Additionally, the District Court permitted cross-examination of Acosta generally regarding his fifty-four building code violations, but did not permit questioning of each of the fifty-four violations, individually. When the District Court instructed Friedman's counsel to ask general questions about the issue but avoid specific questions with regard to every single violation, Friedman's attorney responded that he "wasn't planning on it." (Id.)

Prior to trial, the Government had provided the defense with a disclosure letter, pursuant to Giglio, which included the following paragraph:

> Silvio Acosta has identified approximately 11 properties for which he was told by Zanardelli or Thomas O'Malley, who was Zanardelli's successor, to disregard apparent violations. The properties include Zanardelli's residence, although Acosta is not aware that the property belongs to Zanardelli. Acosta states that this behavior started approximately two years ago.

(Appellant's Br. at 42.) At trial, Acosta testified that Zanardelli or his successor, O'Malley, never told him to ignore violations for eleven properties and the Government did not identify eleven properties for which Acosta was told

8

to ignore apparent violations. The Government represented to the District Court that Mr. Acosta had not retracted his statement during witness preparations and that "[t]he first time we heard about it was when Mr. Acosta testified. It came as a surprise to us just like it came as a surprise to [Appellant]." (App. at 195.) The District Court denied a motion for mistrial, explaining that there was not sufficient prejudice and that Appellant had every opportunity to cross-examine Acosta on the issue. Notably, the District Court also stated that "[w]hatever [was] said during [Friedman's counsel's] opening statement with regard to this had so little traction I don't remember it. I daresay most of the jurors wouldn't have remembered it." (Id.)

The Government also submitted discovery to Friedman of a statement made by Friedman's real estate broker, Scott Callahan ("Callahan"), to the FBI that Friedman told Callahan that the town did not consider one of Friedman's apartments to be legal. The Government concedes that it interviewed Callahan at a later date and at that time, he denied having made the above-mentioned statement. At trial, Callahan testified that Friedman had not immediately disclosed the illegal apartment to Callahan.

On November 19, 2009, the District Court gave the government's proposed instruction on the theory of defense:

> It is not a defense to the crime of bribery that a defendant claims he was coerced or extorted into paying a bribe. Extortion and coercion are not a defense to bribery. The reason for this is that giving a bribe to an official

9

undermines governmental integrity, even where an official solicits money to do acts that the official is obligated to do anyway. The correct decision in such a situation is to refuse the elicit [sic] overture and to report it to the appropriate authorities, not to pay the bribe.

In addition, it is not a defense to bribery that the official action that was the subject of the bribe might have been lawful. It makes no difference whether the official action sought to be influenced was right or wrong. That is, it makes no difference that the bribe giver may have paid the official to perform an act to which the bribe giver was legally entitled.

(Id. at 683.)

Friedman's proposed instruction with respect to the theory of defense:

It is not a complete defense to the crime of bribery that a defendant claims he was coerced or extorted into making a payment to a public official. That is, you cannot find the defendant not guilty of the bribery charged simply because

10

he was the victim of extortion by the public official whom he paid. However, the fact that the defendant was extorted or coerced, while it is not alone a defense to the charge, may bear upon whether the defendant ever formed the intent required to commit the crime of bribery, specifically upon whether he committed the act, "willfully," that is, with a purpose to disobey or disregard the law.

"Extortion" means obtaining property from another, with his consent, in either one of two ways: [] inducing or bringing about this consent through the use of actual or threatened force, violence or fear, which can include fear of economic harm or hardship, which exists if a victim experiences anxiety, concern, or worry over expected personal economic harm, and which fear must be reasonable under the circumstances existing at the time of the defendant's actions.

As I also explained to you earlier, a person may be guilty of bribery whether or not the official action sought to be influenced was right

11

or wrong. That is, a bribery defendant may be guilty even if he paid the official to perform an act to which the defendant was legally entitled.

However, you may consider whether the defendant believed that he was paying the official to perform an act to which he believed he was legally entitled in evaluating whether the government has proven that the defendant had the intent required to commit the bribery at issue, that is, whether the government has proven that he had the purpose to disobey or disregard the law.

(Appellant's Br. at 19-20.) The District Court rejected Friedman's proposed instruction, stating, "I think that's confusing. I have thought about it. I've read your submission. I reject it. I think it's confusing." (App. at 649-50.)

The jury convicted Friedman of bribery. Following the conviction, Friedman filed a motion for a new trial based on the District Court's denial of Jaeger's testimony, the limitation on Acosta and Zanardelli's cross-examination, and the Government's failure to disclose Giglio and Brady material to the defense regarding Acosta and Callahan. The District Court denied the new trial motion.

12

In Friedman's sentencing memorandum he raised several arguments. Most prominently, he raised the issue of unwarranted disparities in sentences, pursuant to § 3553(a)(6). In particular, he emphasized that based on his proposed Guidelines sentence, there would be a significant disparity in his sentence as compared to Anthony Lam, who was convicted of the same offense—making a cash payment of $5,000 to Zanardelli, in violation of 18 U.S.C. § 666(a)(2)—and received a sentence of three years' probation. Likewise, Friedman contended that his sentence, as proposed by the Guidelines, would be disparate from Zanardelli's 24-month sentence, which had already been imposed by the District Court.

Friedman also moved for a downward departure from the Sentencing Guidelines, arguing that he had committed the offense because of "serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." U.S.S.G. § 5K2.12. The District Court sentenced Friedman to a 34-month term of imprisonment and a $25,000 fine.

The District Court began the sentencing proceeding by discussing the loss calculation. The District Court acknowledged that both the Presentence Report and the Government concluded that the total offense level should be 22 and a term of imprisonment for that level would be 41 to 51 months, based on a net value of the benefit of $67,647. Friedman's counsel argued that the only certain figure was the $5,000 bribe; as such, the total offense level should be 16, with a term of imprisonment of 21 to 27 months.

In response to the parties' arguments, the District Court stated

> Neither calculation, it seems to me, is perfect or altogether satisfying. [Defense counsel] is correct when he says that when you start going into the facts and try to determine, well, what was the . . . building going to sell for with or without that apartment, going at it backwards, forwards, is not a totally satisfying exercise . . . . Mr. Friedman has a criminal history of 1, and so everything in terms of where in the guidelines one would find the correct and accurate number depends on how one determines the net value of the benefit here.
>
> I think it's somewhere in between, quite frankly. I think there's no question but the $5,000 bribe just in and of itself does not adequate [sic] and fairly produce the value, and the guideline language of the manual suggests that only if that's the last alternative, would you turn to the amount of the exact bribe.

(Id. at 957-58.)

Later, the District Court stated, "it seems to me that something less than the 22 is fair in this case, but I do think

14

that a custodial sentence should be imposed, and I do think that a sentence of 34 months is a fair sentence in this case. And the Court intends to impose it." (Id. at 962.)

At the end of the sentencing proceeding, the Government requested clarification on the District Court's Guideline calculation, explaining that it had "inferred from [the District Court's] comments, Your Honor, that you had said that the value was somewhere between the 67 that we argued for and the 5 of the defense." (Id. at 967.) The District Court replied, "That's correct." (Id.) The Government further inquired, "[a]nd so the range that's in the middle of that is 10 to 30, which would be a plus 4 enhancement, make [sic] him a Level 20 with a 33- to 41-month range." (Id.) The District Court concluded that, "34 would be a Level 20. Or it could be Level 19 because it would be in the middle of -- and it could be – yeah, it could be a 19 or a 20 . . . . If you'd like me to say it's a specific number, it's either 19 or 20." (Id. at 967-68.)

The District Court, after hearing arguments regarding a downward departure based on coercion, blackmail, or duress, stated at the sentencing proceeding:

> I am convinced based on the testimony at the trial, listening to it carefully, that the defendant thought about [the bribe], seemed to have no moral objection to it, seemed willing, but then wasn't – couldn't – did nothing for a while. But I am absolutely persuaded from the testimony on the – the tape recordings and everything I

15

heard, that he really wanted to sell this building when the opportunity appeared, and it was his anxious—anxiousness to sell that building to[o] quickly not [to] go the whole nine yards, but to quickly get that certificate of occupancy, which motivated him to just pay the bribe and get it over with. And so he did, as we saw in the video.

(Id. at 959.)

The District Court went on to say:

I think that 34 months is [a] fair sentence, and I've considered the nature of the offense, I've considered the offender himself, the full penalty of the trial. This is not a case in which I impose [the] sentence based on a guilty plea, where I don't get to know anything about the facts of the case. I sat here and listened to the witnesses testify. And so I sensed and became – was able to absorb the interior of this fact pattern. I considered that. I considered the seriousness of the offense and the other factors which have been set forth as the 3553 factors.

16

(Id. at 963.)  The District Court also noted that it was required to "consider a fairness with regard to other offenders who are sentenced by this Court."  (Id. at 961.)

In the District Court's Statement of Reasons, it explained that it "lowered the 'net value of the benefit' in the [Presentence Report] because of its uncertainty.  Instead of imposing [a] sentence at level 22, [the District Court] imposed a sentence at a level 20 (although 34 months custody is also embraced within a level 19)."  (Id. at 8.)  Next, the District Court stated that it "reject[ed] the notion that the $5,000 bribe figure should determine the offense level under the guidelines."  (Id.)

The District Court entered the Judgment of Conviction and sentence.  Friedman filed a timely appeal.

## II.  JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction, pursuant to 28 U.S.C. § 3231.  We have jurisdiction to review challenges to a conviction under 28 U.S.C. § 1291 and challenges to the sentence under 28 U.S.C. § 3742(a).  We review the District Court's refusal to give specific jury instructions for abuse of discretion, but exercise plenary review over whether the District Court gave a correct statement of law in its jury instructions.  United States v. Jimenez, 513 F.3d 62, 74 (3d Cir. 2008).  Evidentiary rulings are reviewed for abuse of discretion, United States v. Starnes, 583 F.3d 196, 213-14 (3d Cir. 2009), but even erroneous rulings only require a new trial if the ruling affects a "substantial right of the party," FED R. EVID. 103(a).  An error in an evidentiary ruling is harmless error when "it is highly probable that the error did not affect the result."  Hill v. Laeisz, 435 F.3d 404, 420 (3d Cir. 2006).

17

This Court will only reverse a district court's limitation on cross-examination where the limitation "is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." United States v. Casoni, 950 F.2d 893, 918-19 (3d Cir. 1991) (internal quotation marks and citations omitted). The District Court's decision to limit cross-examination is reviewed for abuse of discretion. United States v. Ellis, 156 F.3d 493, 498 (3d Cir. 1998).

When a motion for a new trial is based on a Brady claim, we "conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact." United States v. Pelullo, 399 F.3d 197, 202 (3d Cir. 2005) (citation omitted).

## III. ANALYSIS

1. Jury Instructions

Friedman maintains that the District Court abused its discretion in rejecting his proposed jury instruction because Friedman argues that an instruction that coercion bears upon the defendant's state of mind is required.

This Court has established that "[a] defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial." United States v. Hoffecker, 530 F.3d 137, 176 (3d Cir. 2008) (citation and internal quotation marks omitted); see also United States v. Davis, 183 F.3d 231, 250 (3d Cir. 1999) ("A court errs in

18

refusing a requested instruction only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant."). We have cautioned that a defendant is "not entitled to a judicial narrative of his version of the facts, even [if] such a narrative is, in one sense of the phrase, a 'theory of defense.'" Hoffecker, 530 F.3d at 176 (citation and internal quotation marks omitted).

Friedman has not established that his proposed jury instruction was a correct statement of the law—that coercion or extortion bears upon the defendant's state of mind for bribery. Friedman presents no support for his proposition that coercion bears upon the specific intent, or lack thereof, for bribery.

Friedman concedes that it is a matter of first impression in this Circuit whether the defendant is entitled to an instruction that extortion or coercion, while not a complete defense to bribery under § 666, may bear upon whether the defendant ever formed sufficient intent to commit the crime. Nothing in Supreme Court precedent, this Court's precedent or the Third Circuit Model Jury instructions for bribery under § 666(a)(2) requires an instruction that coercion or extortion be considered by the jury for the defendant's intent to bribe.[1]

---

[1] The Third Circuit Model Jury Instructions for 18 U.S.C. § 666(a)(2) is as follows:

> Count (*No.*) of the indictment charges the defendant (*name*) with (*describe offense; e.g., bribing an agent of a*

19

*federally funded program*), which is a violation of federal law.

In order to find the defendant guilty of this offense, you must find that the government proved each of the following five elements beyond a reasonable doubt:

First: That at the time alleged in the indictment, (*name of agent*) was an agent of (*specify organization, government, or agency*);

Second: That (*specify organization, government or agency*) received federal benefits in excess of $10,000 in a one-year period;

Third: That (*name*) [*(gave) (agreed to give) (offered)*]) something of value to (*name of agent*);

Fourth: That (*name*) acted corruptly with the intent to influence or reward (*name of agent*) with respect to (*the business*) (*a transaction*) (*a series*

20

Friedman asserts that his proposed instruction is correct law in the United States Court of Appeals for the Second Circuit. Hence, although a correct statement of law in that Circuit, its value within the confines of Hoffecker, is limited. Moreover, the instruction approved in the Second Circuit is more limited in scope than Friedman's proposed instruction. Specifically, the Second Circuit has found that coercion can bear on the intent required for the commission of bribery only where: (1) the defendant is paying the official to perform an act to which he is legally entitled and (2) the official threatens the defendant with "serious economic loss" unless the bribe is paid. See United States v. Barash, 365 F.2d 395, 401-02 (2d Cir. 1966).

Friedman's proposed instruction, in contrast, did not limit the consideration of coercion to situations in which the defendant was legally entitled to the act. While his proposed instruction did include an explanation that the jury could consider whether the defendant believed that he was paying Zanardelli for an act to which he was legally entitled, it would have charged the jury that extortion or coercion "may bear upon whether the defendant ever formed the intent required to commit the crime of bribery," even when the defendant was not legally entitled to the act. (Appellant's Br. at 19.)

---

*of transactions*) of (*specify organization, government or agency*);

Fifth: That the value of the (*business*) (*transaction*) (*series of transactions*) to which the payment related was at least $5,000.

Friedman argues that his proposed instruction is supported by the language of the federal statute for bribery under which he was convicted, 18 U.S.C. § 666. The bribery statute criminalizes the actions of an individual who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward" a government agency involving anything of value of $5,000 or more. 18 U.S.C. § 666(a)(2). According to Friedman, forming corrupt intent can be negated by coercion, because coercive conduct by Zanardelli could have influenced Friedman's state of mind, and that the jury should have been charged accordingly. We reject this argument.

In Hoffecker, this Court was faced with a similar argument, namely that a theory of defense to negate intent in a material misrepresentation case should have been permitted in a jury charge to explain that the defendants lacked intent. 530 F.3d at 177. However, this Court rejected that argument on the basis that it duplicated other instructions that the District Court gave on the subject of criminal intent, such as instructions on "knowingly and willfully" and the "good faith defense" to fraud. Id.

Likewise, in this case, Friedman's argument is that his proposed theory of defense instruction would negate the intent requirement set forth in 18 U.S.C. § 666(a)(2). But, the District Court provided thorough instructions as to the elements of bribery under the relevant statute, defining "knowingly," "corruptly," and "willfully." (App. at 679-80.) In particular, the District Court instructed the jury that it may consider "all the other facts and circumstances shown by the evidence that may prove what was in his mind at the time" and whether Friedman had intended a lawful or unlawful end. (Id. at 679.) Thus, the jury was free to consider all

22

circumstances and arguments set forth by Friedman as to why the element of intent was not satisfied and the District Court did not abuse its discretion in denying a separate instruction on intent.

Even if Friedman's proposed jury instruction was a correct statement of the law, Friedman's instruction on coercion or extortion is not supported by the evidence in the record. The facts in this case do not constitute coercion or extortion. Friedman did not bribe Zanardelli in exchange for an act to which he was legally entitled. He gave the bribe to Zanardelli in exchange for the illegal act of Zanardelli legalizing the sixteenth unit without a variance. Additionally, Zanardelli did not threaten Friedman with economic loss. Zanardelli frequently clarified that Friedman could proceed through the normal route of applying for a variance. Although obtaining a variance requires time and money, it is the correct legal process that should have been followed and informing someone of the correct, legal steps they should take, in itself, is not threatening serious economic loss. That Friedman would likely lose a potential buyer for his apartment building is also not Zanardelli threatening Friedman with serious economic loss. There is no evidence that the potential buyer's threat to pull out of the deal was influenced by Zanardelli's action.

In light of our conclusion that Friedman's proposed instruction was not a correct statement of law, nor was his theory supported by the facts, we need not discuss whether the failure to include an instruction would have denied Friedman a fair trial.

2. Exclusion of Witness Testimony

Friedman asserts that the District Court erred in precluding assistant tax assessor Michael Jaeger's testimony. As a result, he requests reversal of the conviction and remand for a new trial. We disagree.

Federal Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." FED. R. EVID. 402. Under Federal Rule of Evidence 401, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

Evidence that is relevant may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. The District Court's discretion is "construed especially broadly in the context of Rule 403." United States v. Kemp, 500 F.3d 257, 295 (3d Cir. 2007) (citation and internal quotation marks omitted).

Jaeger testified at a Federal Rule of Evidence 104 hearing that the property record card showed that the building had sixteen units, was the most current and accurate record maintained by the Tax Department, and was the record upon which the WNY Building Department relied to determine the number of units in a building. The District Court excluded this testimony because it was distracting and not relevant.

24

Friedman argues that Jaeger's testimony shows that Zanardelli induced Friedman's payment by claiming that the records showed that the building had only fifteen units, when the records actually reflected sixteen units. From this evidence, Friedman contends, the jury could have inferred that Zanardelli induced Friedman's payment.

The District Court did not abuse its discretion in precluding Jaeger's testimony. While Jaeger did testify as to the number of physical units reported on the card, his testimony was clear that the property record card indicated, in handwritten notes by Jaeger's secretary, that the number of *physical* units was sixteen. Nowhere in Jaeger's testimony does he say that the number of *legal* units was sixteen. It is undisputed that the building physically had sixteen units, thus testimony about the number of physical units is not relevant.

Moreover, Jaeger testified at the Rule 104 hearing that that he did not have knowledge of whether Zanardelli had seen the property record card. This renders his testimony not relevant to support Friedman's theory that Zanardelli lied to Friedman about what the property record card reflected. Zanardelli responded on cross-examination that he had not seen the tax records. Friedman could have argued, without Jaeger's testimony, that Zanardelli intentionally overlooked the tax records, thus Jaeger's testimony that he did not know whether Zanardelli saw the records is not relevant. There was no error here; thus, we need not determine whether the error was harmless. The District Court did not abuse its discretion in rejecting Jaeger's testimony.

3. Limitation of Cross-Examination

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. Yet, the Confrontation Clause does not grant unfettered rights to cross-examine witnesses. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (citation and internal quotation marks omitted); United States v. Casoni, 950 F.2d at 919 ("Van Arsdall requires us to strike a balance between the constitutionally required opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination."). District courts have discretion to "impose reasonable limits on such cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.[2]

Friedman claims that his Sixth Amendment right to confrontation was violated because the District Court limited the scope of cross-examination regarding both Zanardelli and Acosta. While the District Court did limit the extent of Friedman's cross-examination, it was not violative of the

---

[2] Federal Rule of Evidence 611(a) states: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." FED. R. EVID. 611(a).

Constitution. The District Court permitted the full scope of cross-examination of Zanardelli regarding money he had received on twenty-two properties to facilitate building approvals but limited the specific details that could be delved into. Most important, Friedman was still permitted to question Zanardelli generally on these matters.

Friedman's cross-examination of Zanardelli sought to obtain information regarding the amount of the bribes, what Zanardelli did with the bribe money he received, and the identities of multiple people from whom Zanardelli received bribes. Friedman argues that he should have been permitted to show through cross-examination that Zanardelli solicited bribes, rather than merely accepted bribes. But the District Court allowed multiple opportunities to obtain this testimony. Friedman's counsel asked on cross-examination, "but there were bribes that you solicited, right? That's what you pleaded guilty to." (App. at 378.) Later, Zanardelli was asked: "Were people just coming in and offering you bribes?" (Id. at 386); "Were there times when you solicited bribes and people refused to pay them?" (Id. at 387); and "Were there times when you asked for [bribes] and people refused to pay them?" (Id. at 388).

Zanardelli responded, on the record, to these questions. The jury heard direct evidence and admissions of Zanardelli's wrongdoing. The District Court's limitation was reasonable and did not deny Friedman his Sixth Amendment right to confront witnesses against him. The District Court did not abuse its discretion by limiting Friedman's ability to cross-examine Zanardelli.

Similarly, the District Court permitted cross-examination of Acosta generally regarding fifty-four

27

violations of the building code, that he failed to accurately report, as part of his inspection duties. On the other hand, the District Court did not permit questioning regarding each and every one of the individual fifty-four violations. Friedman asserts that this limitation prevented him from demonstrating that Acosta manipulated the building code rules that he should have been enforcing and that this manipulation pressured Friedman into bribing Zanardelli to get around the building code. This argument lacks merit.

Friedman's counsel sought to solicit information during cross-examination regarding Acosta's citations for violations of the building code and that he had previously made misrepresentations regarding building units. However, Friedman's counsel's statement at trial undercuts the argument. When instructed to ask general questions about the violations, but to avoid questions regarding each and every specific violation, Friedman's attorney stated candidly that he "wasn't planning on it." (Id. at 171.) Friedman's counsel had not intended to cross-examine Acosta on the individual building code violations anyway.

The District Court's limitation was reasonable and did not deny Friedman his Sixth Amendment right to confront witnesses against him. The District Court did not abuse its discretion in limiting Friedman's cross-examination of Acosta.

With respect to both Zanardelli and Acosta, Friedman had the opportunity to cross-examine them on their alleged wrongdoing and the limitation on cross-examination did not inhibit the argument that Acosta and Zanardelli engaged in malfeasance. The jury learned of the full extent of Acosta's and Zanardelli's malfeasance and criminal activity. The

District Court's ruling on the scope of cross-examination with respect to Zanardelli and Acosta is consistent with Van Arsdall that Friedman does not have the unfettered right to cross-examination.

    4. Giglio

Friedman argues that the Government violated Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) because it concealed certain impeachment evidence related to Acosta and Callahan.

Brady stands for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Under Giglio, "the government must disclose materials that go to the question of guilt or innocence as well as materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." United States v. Milan, 304 F.3d 273, 287 (3d Cir. 2002) (citing United States v. Bagley, 473 U.S. 667, 676–77 (1985)). A defendant must prove three elements for a Brady violation: (1) "the evidence at issue must be favorable to the defendant;" (2) "it must be material;" and (3) "it must have been suppressed by the prosecution." United States v. Reyeros, 537 F.3d 270, 281 (3d Cir. 2008) (citing Pelullo, 399 F.3d at 209; United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991)).

Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

Material evidence can include evidence that may be used to impeach a witness. Id. at 676-77; Giglio, 405 U.S. at 154. However, "impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value." Lambert v. Beard, 633 F.3d 126, 133 (3d Cir. 2011) (citations omitted). On the other hand, it does not follow "that whenever a witness is impeached in one manner, any other impeachment becomes immaterial." Id.

Here, Friedman argues that he was disadvantaged because the Government failed to disclose Acosta's change in testimony. Originally, Acosta had identified properties for which Zanardelli, or Zanardelli's successor, had told him to disregard apparent violations. Later, on cross-examination, Acosta denied this assertion. The defense argued that this change was material and a violation of Giglio and Brady to suppress it. The District Court found that the Government did not suppress the change in Acosta's testimony or intentionally mislead Friedman because the Government was not aware of the change in Acosta's testimony until Acosta was cross-examined at trial. This finding was not clearly erroneous.

Friedman chose not to cross-examine Acosta on the inconsistency of his prior statement and the District Court noted that Friedman's opening statement regarding Acosta's pre-trial statements were not central to his defense. Therefore, the District Court did not abuse its discretion by holding that Friedman was not prejudiced by the lack of prior knowledge of the change of testimony. Further, the result of the trial would not have been different if the change had been disclosed.

30

Next, Friedman requests a new trial based on the Government's failure to disclose a change in testimony by a real estate broker, Callahan. The Government provided discovery to Friedman that Callahan had told the FBI that early in the process of preparing the building for listing to sell, Friedman told Callahan that the Town of WNY did not consider one of the apartments to be legal. Callahan later denied ever making that statement. Friedman asserts that he would have used Callahan's statement to argue that he did not have a corrupt intent in bribing Zanardelli because he was honest in his disclosure to Callahan about the illegal unit. According to Friedman, the Government's failure to disclose this change in testimony about whether Friedman disclosed to Callahan that the unit was illegal deprived Friedman of the opportunity to argue that he did not have a corrupt intent to bribe. The Government concedes that the change in testimony may reflect on Callahan's credibility and that it should have been disclosed to Friedman.

The question that remains given the concession is whether the failure to disclose the change in testimony amounts to a constitutional deprivation requiring the ordering of a new trial. The District Court found that it did not. This finding is not clearly erroneous. Callahan's testimony regarding whether Friedman told him about the illegal apartment is not relevant regarding whether Friedman had a corrupt intent in bribing Zanardelli. The evidence implicating Friedman was that he bribed Zanardelli in exchange for a C.O. to legalize the sixteenth unit. Although the Government concealed evidence from Friedman that may have been favorable to Friedman, the evidence was not material. There is not a reasonable probability that the result of the proceeding would have been different if the Government had

31

disclosed Callahan's change in testimony regarding what Friedman had told Callahan about the illegal unit. The District Court did not err in denying Friedman's motion for mistrial.

5. Procedural and Substantive Unreasonableness in Sentencing

Friedman argues that his sentence is procedurally unreasonable because the District Court did not (1) follow the proper order of the steps set forth in Gunter; (2) compute a definitive loss calculation or offense level to reach the Guidelines range; (3) formally rule on Friedman's departure motion; or (4) meaningfully consider the § 3553(a) factors. Friedman also argues that his sentence is substantively unreasonable.

Here, the District Court did not follow the correct order of the steps set forth in Gunter, did not compute a definitive loss calculation or offense level to reach its Guidelines range nor did it meaningfully consider § 3553(a)(6), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Based on these procedural errors, we will remand to the District Court for resentencing.

Following United States v. Booker, 543 U.S. 220 (2005), we directed district courts to follow a three-step sentencing process. United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). During the first step, a district court must "calculate a defendant's Guidelines sentence precisely as they would have before Booker." Id. (citation omitted). During

the second step, district courts "must 'formally rul[e] on the motions of both parties and stat[e] on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and tak[e] into account [our] Circuit's pre-<u>Booker</u> case law, which continues to have advisory force.'" <u>Id.</u> (alterations in <u>Gunter</u>) (citation omitted). During the third step, district courts must "'exercise [] [their] discretion by considering the relevant [§3553(a)] factors'[3] in

---

[3] The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed - -
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other

setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines." Id.

---

correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for --

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . [that] is in effect on the date the defendant is sentenced;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

(alterations in <u>Gunter</u>) (citation omitted).  During the third step, district courts should engage in "a true, considered exercise of discretion . . . including a recognition of, and response to, the parties' non-frivolous arguments."  <u>United States v. Jackson</u>, 467 F.3d 834, 841 (3d Cir. 2006) (citation omitted).

Appellate review is limited to determining whether the sentence is reasonable.  <u>United States v. Merced</u>, 603 F.3d 203, 213 (3d Cir. 2010) (citation omitted).  Our review for reasonableness proceeds in two stages:  (1) "First, we ensure that the district court committed no 'significant procedural error,' 'such as failing to calculate (or improperly calculating) the Guidelines rage, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" and (2) "if the district court's procedures are sound, we proceed to examine the substantive reasonableness of the sentence."  <u>Id.</u> at 214 (quoting <u>United States v. Tomko</u>, 562 F.3d 558, 568 (3d Cir. 2009); <u>Gall v. United States</u>, 552 U.S. 38, 51 (2007)) (citation omitted); <u>United States v. Levinson</u>, 543 F.3d 190, 195 (3d Cir. 2008) ("[W]e are to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way.").  At both the procedural and substantive stages, this Court reviews for abuse of discretion.  <u>United States v. Negroni</u>, 638 F.3d 434, 443 (3d Cir. 2011) (citation omitted).

To demonstrate that a sentence is procedurally reasonable, a district court must show "meaningful consideration of the relevant statutory factors and the exercise of independent judgment."  <u>United States v. Grier</u>, 475 F.3d 556, 571-72 (3d Cir. 2007) (en banc), <u>cert. denied</u>, 552 U.S.

848 (2007). A major variance from the sentencing Guidelines may require a more significant justification than a minor one. Gall, 552 U.S. at 50.

We will affirm a procedurally sound sentence as substantively reasonable "unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." Tomko, 562 F.3d at 568. We focus on the totality of the circumstances, and the party challenging the sentence bears the burden of proving the sentence's unreasonableness. Id. at 567. "[W]hile reviewing courts may presume that a sentence within the advisory Guidelines is reasonable, appellate judges must still always defer to the sentencing judge's individualized sentencing determination." Rita v. United States, 551 U.S. 338, 364 (2007). "'[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence,'" except to the extent specifically directed by statute. Williams v. United States, 503 U.S. 193, 205 (1992) (quoting Solem v. Helm, 463 U.S. 277, 290 n.16 (1983)).

a. Order of the Gunter Steps

Friedman argues that the District Court erred procedurally by analyzing the Gunter steps out of order. The District Court began its sentencing procedures with the first Gunter step by discussing the disputed loss calculation. Before resolving what the loss or offense level was, the District Court conducted the second step of Gunter and discussed the departure motion. The District Court then returned to a discussion of step one by resolving two other guidelines disputes: whether Zanardelli was a high-level official and whether Friedman accepted responsibility for the

36

crime. Next, the District Court engaged in a discussion of some of the § 3553(a) factors, the third step of Gunter, and then stated that it would impose something less than a Guidelines level of 22 before continuing its discussion of § 3553(a) factors. Finally, the District Court imposed a 34-month sentence, stating it was at an offense level of either 19 or 20.

The Government concedes that the District Court should have completed its calculation of the Guidelines range prior to its § 3553(a) analysis, but contends that Friedman fails to show that the sentencing calculation was impacted by the order of analysis.

The District Court in this matter strayed from our three step process in Gunter. District courts should consider the steps separately and sequentially. See United States v. Lofink, 564 F.3d 232, 242 (3d Cir. 2009) (holding that it was not harmless error for the district court to consider a motion for a downward departure together with the § 3553(a) factors in the third step, rather than as a discrete second step of the process); United States v. Brown, 578 F.3d 221, 226-27 (3d Cir. 2009) (remanding to the district court for conflating the Gunter steps and failing to specify whether the below Guidelines range sentence was a result of a departure or a variance). Following the process set forth in Gunter ensures that the District Court's decision-making process is both logical and fair. Departure and variance motions logically cannot be determined until the district court knows what the Guidelines calculation is. Likewise, the § 3553(a) factors cannot be consulted until after departure and variance motions are completed. The fact that the District Court failed to adhere to this process inhibits our ability to review the sentence for reasonableness and thus requires remand.

37

### b.  Guidelines Calculation

While the District Court ultimately concluded that it was imposing a 34-month sentence, it did not make any determinations as to what the loss calculation and total offense level was to lead it to the appropriate Guidelines range.  Rather, the District Court imposed a 34-month sentence and then stated that this corresponded to a Guideline range of 19 or 20.  Under the Supreme Court and this Court's precedent, the District Court is required to calculate the Guidelines range.  Gall, 552 U.S. at 597.  A sentence rendered without a calculation of the Guidelines range constitutes procedural error.  See id.  In order to determine the appropriate Guidelines range under step one of Gunter, the District Court must determine the total offense level.  Here, the record does not contain an explanation of how a Guidelines calculation of 19 or 20 was reached.  The record merely indicates that the District Court believed the Guidelines calculation should be "somewhere in between" what the Government proposed, 22, and what the defense proposed, 16.  (App. at 958.)

The District Court did not "adequately explain the chosen sentence."  Gall, 552 U.S. at 597.  The "failure to begin with a properly-calculated Guidelines range . . . preclude[s] this Court from concluding that [the procedural error] was harmless error."  United States v. Smalley, 517 F.3d 208, 215 (3d Cir. 2008) (remanding to the district court to properly justify deviating eight months above the upper-end of the properly calculated Guidelines range).  For this reason, we will remand to the District Court to explain and determine a specific Guidelines calculation.

### c.  Departure Motion

Next, Friedman challenges his sentence by asserting that the District Court did not formally rule on his motion for a downward departure for coercion, blackmail, or duress. Under Gunter, a district court must "formally rule on the motions of both parties and state on the record whether [it is] granting a departure and how that departure affects the Guidelines calculation." 462 F.3d at 247. This Court has emphasized the importance of ruling on departure motions:

> [W]e require that the entirety of the Guidelines calculation be done correctly, including rulings on Guidelines departures. Put another way, district courts must still calculate what the proper Guidelines sentencing range is, otherwise the Guidelines cannot be considered properly at Gunter's third step. The scenario is simple: error entering this sentencing step may presage the sentence ultimately set.

Lofink, 564 F.3d at 238-39 (citation omitted).

In Rita, the Supreme Court held that the district court sufficiently rejected the defendant's request for a downward departure when it simply stated that without downward departure, the Guidelines range was not "inappropriate" and the sentence was "appropriate." 551 U.S. at 358. The Supreme Court recognized that the judge could have explained more regarding why it rejected the defendant's downward departure motion, but noted that the "context and

39

the record make clear that this, or similar, reasoning underlies the judge's conclusion." Id. at 359.

In this case, the District Court clearly rejected Friedman's downward departure motion. The District Court explained that it was "convinced based on the testimony at the trial" that Friedman had "no moral objection" to the bribe and that Friedman was not the victim of extortion, but instead was motivated to pay the bribe in order to sell the building quickly and to avoid proper procedures to legalize the sixteenth unit. (App. at 959.) The District Court did not commit procedural error in its resolution of the departure motion.

### d. Meaningful Consideration of § 3553(a) Factors

Friedman's final argument with respect to his sentence is that the District Court failed to give meaningful consideration to the § 3553(a) factors.

In Booker, the Supreme Court held that appellate courts should insure that district courts analyze the § 3553(a) factors when determining sentences for criminal enterprises. 543 U.S. at 261. Sentencing courts must give "meaningful consideration" to the factors in 18 U.S.C. § 3553(a). United States v. Olhovsky, 562 F.3d 530, 546 (3d Cir. 2009). A district court's fail[ure] to consider the § 3553(a) factors can create a procedurally unreasonable sentence. Levinson, 543 F.3d 190, 196 (3d Cir. 2008).

"[T]he district court need not discuss and make findings as to each of the § 3553(a) factors if the record makes clear that the court took the factors into account in sentencing . . . ." United States v. Kononchuk, 485 F.3d 199,

204 (3d Cir. 2007).  Still, "[w]here one party raises a colorable argument about the applicability of one of the factors, [] the court should respond to that argument as part of its 'meaningful consideration of the relevant statutory factors and the exercise of independent judgment.'" United States v. Merced, 603 F.3d 203, 221 (3d Cir. 2010) (quoting Grier, 475 F.3d at 571-72).

A mere recitation of the factors and a statement that counsel's arguments have been considered is insufficient, but "brevity is not error *per se*."  Jackson, 467 F.3d at 841-42 (holding that the district court's statement that it considered the defendant's prior convictions for crimes of violence, circumstances of defendant's upbringing, and financial circumstances was sufficient discussion of the § 3553(a) factors).

During the sentencing proceeding, the District Court stated that it considered the "loving letters from family and friends," the "less-than-disciplined attitude" towards his income taxes, his various housing violations incurred through the years, and an indifference in abiding by the requirements. (Id. at 962.)  The District Court also generally stated that it had considered the § 3553(a) factors.

Friedman raised in his sentencing memorandum § 3553(a)(6), "unwarranted sentencing disparities."  18 U.S.C. § 3553(a)(6).  He referred to the sentence of Anthony Lam, who was convicted of the same offense—making a cash payment of $5,000 to Zanardelli, in violation of 18 U.S.C. § 666(a)(2).  Anthony Lam received a sentence of three years' probation from District Court Judge Garrett E. Brown, Jr. Likewise, Friedman draws attention to the 24-month sentence that the District Court imposed on Zanardelli for accepting

bribes as a public official.  The District Court was intimately familiar with all of the facts as they relate to Zanardelli. Responding to Friedman's motion with respect to § 3553(a)(6) was clearly within the District Court's knowledge of the case.

The District Court's only discussion of this alleged disparity in sentencing was that the District Court noted that it was required to "consider a fairness with regard to other offenders who are sentenced by the Court."  (App. at 961.) The District Court did not state whether there was a sentencing disparity or address whether comparing Friedman's sentence to Lam's sentence or Zanardelli's sentence demonstrated a sentencing disparity.  The District Court must address whether there is a sentencing disparity because there is no explicit discussion or indication in the record that it was considered.  See Negroni, 638 F.3d at 446 (3d Cir. 2011) ("While the District Court identified the concern and stated it had considered that factor, it provided no explanation for why the sentence it imposed was justified despite the clear disparity it seemed to create."); Merced, 603 F.3d at 225 (requiring remand where Merced's sentence was 128 months less than what a similarly situated defendant could expect to receive under the circumstances and there was no explicit discussion or indication in the record that the district court considered this disparity); cf. United States v. Larkin, 629 F.3d 177, 196 (3d Cir. 2010) (finding no procedural error in the district court's discussion of the sentence disparity because the District Court explained the similarity in conduct between the defendant and the co-defendant).

For the reasons discussed above, we will remand to the District Court for resentencing to cure the procedural errors in the sentence.[4]

## IV.  CONCLUSION

We will affirm the judgment of conviction, vacate the sentence, and remand for resentencing, in accordance with this opinion.

---

[4] In light of our decision to remand for procedural error, we need not consider Friedman's arguments that the sentence was substantively unreasonable.  See Merced, 603 F.3d at 214 ("If the district court commits procedural error, our preferred course is to remand the case for re-sentencing, without going any further." (citation omitted)).