In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3493 & 09-3636

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT B. LONG and JASON P. EDWARDS,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cr-0088—**Larry J. McKinney**, *Judge.*

ARGUED JANUARY 19, 2011—DECIDED MARCH 22, 2011

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge.* Robert Long and Jason Edwards were corrupt narcotics detectives who, over the course of several months, capitalized on their police authority to steal marijuana and drug money from Indianapolis-area criminals. Unbeknownst to the two, some of their thefts were coordinated stings by law enforcement. Based on wiretap recordings and evidence from the stings, Long and Edwards were arrested and convicted

of possession of marijuana, attempted possession, and narcotics conspiracy. Edwards now attacks his conviction, claiming the district court erred when it denied his motion to dismiss evidence related to the wiretap order on his phone, while Long raises a laundry list of complaints related to his sentence. We find none of these contentions meritorious, and accordingly affirm Edwards's conviction and Long's sentence.

## I. BACKGROUND

In early 2008, police began to suspect that Long and Edwards—two detectives assigned to the Dangerous Drugs Section of the Indianapolis Metropolitan Police Department ("IMPD")—were cooking up ways to illegally supplement their income. Police became aware of Long's plans when he foolishly asked an informant if he would be willing to help Long pilfer drugs and money from area drug couriers. The informant hinted that he would be willing and then—faithful to his title—immediately informed police of Long's inquiry.

Officers decided to set up a sting on Long, both to gather evidence and to determine the size of his operation. They wired an informant, who met with Long on March 12, 2008. The informant told Long that he was meeting with a drug courier that night and that, after their exchange, the courier would be carrying a large sum of money. The supposed courier was actually undercover officer Adalberto Martinez. Martinez met the informant in his car as planned and pretended to receive cash from him. After Martinez drove off, Long worked

with Edwards and IMPD officer James Davis to locate Martinez. Davis, driving his IMPD patrol car, pulled Martinez over under the guise of a legitimate traffic stop. Long arrived shortly thereafter in his unmarked detective's car. Long and Davis then seized the cash in Martinez's car and sent him on his way. Long gave half of the cash to the informant as planned and split the rest between Davis, Edwards, and himself.

Following the March 2008 rip-off, the government obtained wiretaps on Long's phones. Using those wiretaps, the government recorded several incriminating calls between Long and other parties throughout April 2008. The first were a series of calls between Long and his cousin, Kabec Higgins, during which Long tipped Higgins to an impending narcotics search of Higgins's business. The next was a conversation between Long and an officer with the Columbus Police Department, during which the officer (as part of his legitimate duties) told Long about a suspicious package destined for Indianapolis. Rather than conduct a lawful seizure, Long went to the address himself and signed for the package, which contained marijuana. Edwards and Long divided the marijuana, storing some at Edwards's home and turning the rest in to the IMPD (ostensibly as part of a legal interdiction). The two ultimately sold the marijuana to Higgins and divided the proceeds.

Still unsure as to how many people were involved in the schemes, the government obtained another wiretap order on May 13, 2008—this time on Edwards's phone. That same day, Long received a tip from an officer in

Chandler, Arizona, regarding a suspicious package that had been intercepted while en route to Indianapolis. Long asked the Arizona authorities to ship the package to him, telling them he would attempt a controlled delivery. Long then contacted Edwards, telling him that once he received the parcel, he would "get a warrant for it, open it," and then "switch the shit out real quick." Long signed for the package on May 15, 2008. After telephoning Edwards and agreeing on the best way to steal some of the marijuana, Long obtained a search warrant for the parcel predicated on false information, removed some of the marijuana, and stored the remainder in the IMPD property room (again claiming the drugs were proceeds from a lawful seizure). Long then distributed some of the marijuana to Higgins for sale.

Unaware that federal and state law enforcement were monitoring them, Long and Edwards continued their spree. In late May 2008, Edwards received a call from one of his informants, who provided a tip that a drug dealer living at the Country Club Apartments in Indianapolis had over one hundred pounds of marijuana in his apartment. Edwards, Long, and Davis had a number of discussions in which they planned to steal the marijuana from the dealer, sell it, and split the proceeds between the three of them and Edwards's informant. On May 30, 2008, Edwards provided Long and Davis with the drug dealer's address. Long and Davis then fabricated a warrant and used it to convince the apartment manager to let them into the residence. To their disappointment, they found nothing.

Let down by their fruitless search, Long and Edwards turned to another opportunity. In May 2008, an informant working for the FBI told Long about a home in Indianapolis containing a large quantity of marijuana and drug money. Unbeknownst to Long and his compatriots, the FBI was operating the residence and monitoring it with recording equipment. On June 2, 2008, the informant gave Long the address of the home and told him it would contain up to 250 pounds of marijuana and up to 60,000 dollars. That day, the FBI recorded Long, Edwards, and Davis enter the residence and retrieve the marijuana and money. Long then delivered the proceeds to the informant as planned. The informant kept the drugs and some of the cash, leaving Long, Edwards, and Davis to split the rest.

Still concerned that more officers might be involved, the FBI developed a scenario that would require more participants. In late May, the same informant who tipped Long about the stash house surreptitiously operated by the FBI told Long of a U-Haul truck coming into town that would be carrying between 500 and 700 pounds of marijuana. Long agreed to seize the U-Haul and deliver it to the informant in exchange for a large bounty.

On June 12, 2008, Long met with the informant about the scheme and learned that the truck would be coming into Plainfield, Indiana—a town just west of Indianapolis—that evening. Long contacted Davis and Edwards and updated them. Edwards agreed to participate, but Davis was unavailable. Davis couldn't find anyone in the IMPD willing to assume his role, so Long tricked a

Plainfield police officer into assisting, telling the officer that the operation was a legal seizure. Edwards met Long at the location where they planned to stop the truck, but nothing came of their plan, as the truck was fictitious—a ruse designed by the FBI to determine if there were any more conspirators prior to arrest.

Satisfied that all of the participants had been identified, the FBI arrested Long and Edwards on June 16, 2008. Prior to trial, Edwards moved to suppress the wiretap recordings, arguing that the affidavit in support of the wiretap order for his phone lacked sufficient facts to establish necessity for the wiretap. The district court denied the motion.

Long and Edwards were ultimately found guilty by a jury. Long was convicted of one count of narcotics conspiracy, three counts of possession with intent to distribute marijuana, and one count of attempted possession with intent to distribute marijuana. Edwards was convicted of the same, minus one count of possession with intent. After a hearing, Long was sentenced to twenty-five years' incarceration and Edwards to seventeen years' incarceration. Edwards appealed his conviction, while Long appealed his sentence.

## II. ANALYSIS

### A. Robert Long's Sentence

We deal first with Long's sentence. Prior to Long's sentencing hearing, probation prepared a presentence report ("PSR"). The PSR concluded that Long stole or

intended to steal 421 kilograms of marijuana throughout the conspiracy count, which led to a base offense level of 28. The PSR went on to recommend a two-level increase for possession of a firearm, along with adjustments for obstruction of justice, organizing a conspiracy, and abusing the public trust. Based on an adjusted offense level of 38 and a criminal history category of I, the PSR recommended a guidelines range of 235 to 293 months' incarceration.

At the sentencing hearing, the district court began by soliciting objections to the findings in the PSR. After sustaining one objection to the organizing adjustment, the district court found that Long's adjusted offense level was 36 and that his criminal history category was I, yielding a guidelines range of 188 to 235 months' incarceration. After inviting commentary regarding its guidelines calculation, the district court issued Long's sentence. The court found that Long possessed or intended to possess 421 kilograms of marijuana, requiring a base offense level of 28, and that Long possessed a firearm at two points during his crimes, leading to a two-level increase. After applying appropriate adjustments, the court concluded that the guidelines range was a period of 188 to 235 months' incarceration. The court then considered the 18 U.S.C. § 3553(a) factors and ultimately departed upward from the advisory guidelines range, sentencing Long to twenty-five years' incarceration.

On appeal, Long claims the sentencing hearing was rife with errors. While his brief is less than clear, Long seems to contend that the court erred when it failed to

follow the proper sequence of events in calculating his guidelines range, failed to enter necessary findings of fact to support its drug quantity calculation, misapplied a firearm possession enhancement, and neglected to reduce Long's sentence to account for the government's alleged misconduct during the investigation. We will address each argument in turn.

### 1. The Procedural Sequence of the Sentencing Hearing

Long first contends that the district court erred when it failed to follow the proper sequence of events at the sentencing hearing. We review the district court's sentencing procedures *de novo*. *United States v. Coopman*, 602 F.3d 814, 817 (7th Cir. 2010).

As the Supreme Court has made clear, a district court should begin a sentencing hearing by calculating the advisory guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Glosser*, 623 F.3d 413, 418 (7th Cir. 2010). The court will then subject its proposed sentence to adversarial testing, hearing arguments as to whether the advisory sentence should apply. *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Smith*, 562 F.3d 866, 872 (7th Cir. 2009). Finally, the court will evaluate the § 3553(a) factors and impose sentence, providing an "adequate statement of the judge's reasons, consistent with section 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant." *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005).

Long first argues that the district court should have initiated the sentencing hearing by immediately calculating the guidelines range, rather than engaging in a preliminary discussion of the findings in the PSR. As support, Long points us to the Supreme Court's statement in *Gall* that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." 552 U.S. at 49. But Long's overly literal interpretation of the statement in *Gall* ignores a crucial concept: namely that a discussion of the PSR and its findings is often an important first step employed by a district court in coming to a correct calculation of the advisory guidelines range. This is reflected by the Supreme Court's statement in *Rita* that a "sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines." 551 U.S. at 351. Because a consideration of the PSR is a permissible—and often useful—part of the guidelines-calculation process, we see no error on this point.

Long goes on to claim that the court did not follow the appropriate sequence when it failed to enter a drug quantity finding prior to making its guidelines range calculation. We have our doubts as to whether Long's premise is accurate: read in context, the record strongly suggests that the district court adopted the uncontested quantity findings in the PSR before putting forth its guidelines determination for adversarial testing. But even if the court failed to enter a finding on drug quantity before announcing its guidelines calculation, this error was certainly harmless, cured by the court's

subsequent finding regarding the total amount of marijuana Long intended to possess.[1]

### 2. The Drug Quantity Determination

Long next contends that the district court's total drug quantity finding was deficient, as the court failed to enter necessary, subsidiary findings of fact to support its overall quantity determination. Because Long failed to object to the court's quantity determination, we review this claim for plain error. *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010). To establish plain error, Long must show that there was an obvious error that seriously affected both his substantial rights and the "fairness, integrity, or public reputation of judicial proceedings." *United States v. Courtright*, 632 F.3d 363, 371 (7th Cir. 2011).

For narcotics offenses, a defendant's base offense level is calculated by aggregating drug quantities specified in the counts of conviction with other quantities not

---

[1] Long claims that the court's total quantity finding came too late to give him a meaningful opportunity to object. But Long was given three opportunities to object to the quantity ultimately used by the district court: first when the court solicited objections to the PSR, which included the amount Long now disputes; second when the court implicitly adopted the PSR amount in its initial guidelines range calculation; and third after the court explicitly found that Long intended to possess that quantity of marijuana, imposed sentence, and invited further comments from counsel.

specified in the counts of conviction that qualify as "relevant conduct" under the guidelines. U.S.S.G. § 2D1.1(a) & cmt. 12. "Relevant conduct" includes acts that were "part of the same course of conduct or common scheme or plan" as the counts of conviction. U.S.S.G. § 1B1.3(a)(2).

Long first argues that the district court's total quantity determination was inadequate because the court did not enter incremental findings on the various amounts of marijuana attributable to Long but not specified in the counts of conviction. This claim is belied by the record, which reflects that the court explicitly found Long had intended to possess 421 kilograms of marijuana throughout his crimes based on evidence presented during the case. And the evidence presented included the findings in the PSR, which not only indicated that Long intended to possess 421 kilograms of marijuana, but also laid out with specificity the various amounts of marijuana underlying that sum. Because the findings in the PSR were uncontested, the district court was entitled to rely on them in determining quantity. *United States v. Ali*, 619 F.3d 713, 719 (7th Cir. 2010). Because the court's total quantity finding was based on reliable, incremental findings, we see no error.

Long next claims that the quantity determination was insufficient because the court failed to find that the quantities of marijuana not specified in the conspiracy count qualified as "relevant conduct" under the guidelines. But a review of the record shows that the district court found that Long's conspiracy count "involve[d]"

421 kilograms of marijuana, and that Long "inten[ded] to possess that much marijuana" throughout his crimes. These statements constitute, at least, an implicit finding that those unspecified amounts were part and parcel of the conspiracy count. *See United States v. Wilson*, 502 F.3d 718, 723 (7th Cir. 2007) (statements that show that the district court "plainly believed" that the unconvicted conduct was "part of the same course of conduct" sufficient even without more explicit statements to that effect). While the district court could have been more detailed in its relevancy finding, we believe its statements were adequate to show that the unspecified quantities of marijuana were part of the conspiracy count.

Even if the district court's findings of fact were somehow deficient, Long still has not made out plain error. Deficient findings of fact can be cured, at least for purposes of plain error review, when the district court adopts the PSR in its Statement of Reasons, the PSR provides the necessary factual support for the sentence, and the defendant had an opportunity to object to the PSR's findings. *See United States v. Salem*, 597 F.3d 877, 888 (7th Cir. 2010) (noting that adoption of a PSR's findings in a Statement of Reasons may suffice under plain error review); *United States v. Panaigua-Verdugo*, 537 F.3d 722, 726-27 (7th Cir. 2008) (holding that such an adoption is adequate if the defendant had an opportunity to object). Each of these prerequisites is satisfied here, and thus we find no plain error.

### 3. The Firearm Possession Enhancement

Long next contends that the enhancement for possessing a firearm during the commission of a drug offense was improper. He argues that it was clearly improbable that he used his firearm in connection with the drug pilfering; he instead claims that he possessed his weapon to further his legitimate law enforcement duties, which just happened to coincide with his illegal drug seizures. But one lawful use does not vitiate another unlawful use. *United States v. Shamah*, 624 F.3d 449, 459 (7th Cir. 2010). Long had his gun with him at multiple points during his drug offenses and—in addition to effectuating his other law enforcement duties—his weapon clothed his acts with the authority of a police officer and helped further his crimes. For example, Long made his gun readily available when he illegally entered the home of a drug dealer at the Country Club Apartments, intending to steal the dealer's stash. This conduct alone made the enhancement appropriate.

### 4. Sentencing Manipulation

Long's last complaint is that the government engaged in sentencing manipulation when it instructed its informant to tip Long off to large amounts of fictional marijuana. This claim is without merit, as we have already squarely rejected the defense of sentencing manipulation. *United States v. Garcia*, 79 F.3d 74, 76 (7th Cir. 1996). Long implores us not to apply *Garcia* to his case due to a factual distinction between the two, but his argument

ignores the wide breadth of *Garcia*. *See id*. ("We now hold that there is no defense of sentencing manipulation in this circuit."). And even in those circuits that recognize the defense of sentencing manipulation, those claims do not succeed when, as here, the larger quantity of drugs was used to draw out additional co-conspirators. *E.g.*, *United States v. Moran*, 612 F.3d 684, 692 (8th Cir. 2010). We thus reject Long's final attack on his sentence.

### B. *Jason Edwards's Conviction*

We turn last to Edwards's claim that the evidence obtained from the wiretap on his phone should have been suppressed, as the affidavit in support of the wiretap did not establish necessity. "We review a challenge to the necessity of wire surveillance under an abuse of discretion standard, granting substantial defer-ence to the determination made by the district court." *United States v. Gray*, 410 F.3d 338, 342 (7th Cir. 2005).

To obtain a wiretap, the government must include with its application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). While this necessity requirement discourages the use of wiretaps as a first-line investiga-tive tool in the mine run of cases, it "was not intended to ensure that wiretaps are used only as a last resort in an investigation." *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006). Hence, the government's burden of establishing necessity is not high, and whether it met

that burden is reviewed in a practical, common-sense fashion. *United States v. Campos*, 541 F.3d 735, 746 (7th Cir. 2008).

The affidavit here was more than adequate to establish necessity, especially under our deferential standard of review. The affidavit laid out, in detail, the efforts used to investigate Long and Edwards thus far, the limited success of those efforts, and the government's fear—based on the magnitude of Long and Edwards's acts—that the techniques already used had missed a number of co-conspirators. Edwards's only argument against necessity is that the investigation had already uncovered enough evidence to arrest Edwards prior to the wiretap application. But the fact that arrest could have occurred earlier does not preclude a finding of necessity where, as here, the basis for necessity was a demonstrated need to root out additional co-conspirators. *McLee*, 436 F.3d at 763. We accordingly reject Edwards's challenge to his conviction.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Edwards's conviction and Long's sentence.