In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2101

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HAROLD N. ROSEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:11-cr-30017-MJR-1 — **Michael J. Reagan**, *Judge.*

ARGUED OCTOBER 22, 2012 — DECIDED AUGUST 14, 2013

Before BAUER and ROVNER, *Circuit Judges,* and RANDA,[*]
*District Judge.*

BAUER, *Circuit Judge.* On October 2, 2011, Harold N. Rosen
pleaded guilty to seven counts of wire fraud for his perpetra-
tion of a fairly elaborate fraud scheme, centered around the

---

[*] Of the United States District Court for the Eastern District of Wisconsin,
sitting by designation.

development of an affordable housing project that was to be built in East St. Louis, Illinois. Rosen now appeals the district court's calculation of the loss amount, the determination that Rosen was an organizer or leader of criminal activity, and the reasonableness of his sentence. We affirm.

## I. BACKGROUND

Rosen, the owner of Kully Construction, LLC, submitted a development plan to the city of East St. Louis ("the City") to develop an affordable housing project known as the Bowman Estates. The project was to be constructed through a combination of private and public investment and was to be developed by Kully Construction and Rosen. The project's plans called for a $5,624,050 development, approved by the City council, that allowed for the contribution of $800,000 of federal grant funds, $1,124,810 in Tax Increment Financing ("TIF"), and a contribution of $3,699,240 in private funding by Rosen and Kully Construction, as a condition of receiving the public financing funds.

To obtain this contract, Rosen lied at nearly every turn. First, Rosen submitted a development plan to the City. The proposal was almost entirely fictitious. The plan falsely stated that Kully Construction had over twenty years of experience in completing successful housing projects. The plan named Tracy Hawkins as CEO of Kully Construction and lauded her more than ten years' of housing development experience; in reality, Hawkins was a secretary and part-time hairdresser. The plan falsely asserted that Rosen was a seasoned project manager with over twenty years of experience on major housing projects; in truth, he had never worked as a developer.

There was even a news article published in the St. Louis Post Dispatch on March 17, 2006, supporting Rosen's business proposal and affirming his credentials. The article recounted how Rosen obtained a forty-million-dollar contract with the Philippine Government to develop a trash-to-energy power plant. Rosen claimed he became involved in the business of converting trash into usable power as a result of his deep-rooted sympathy for the children exposed to garbage dumps in the Philippines. The article also noted that Rosen was awarded a twenty-five year contract, at the conclusion of which he would turn the plant over to the Philippine Government. Rosen now admits that he had no such investment in the Philippines and that the entire story was concocted in hopes of bolstering his reputation as a successful developer.

## A. Scheme to Substitute Prefab Modular Housing for New Construction

Duped by his ploy, the City contracted with Rosen for the construction of a thirty-two unit housing project. After meeting with a consultant on July 1, 2008, however, it was brought to Rosen's attention that his project was underfunded by approximately $2.7 million dollars because the projected rental income was inadequate to support the anticipated expenses. Rosen concealed his under funding problem from the City, and instead addressed the issue by offering to "upgrade" the project—from thirty-two units to fifty-six units—at no additional cost. Rosen misrepresented to the City that he could increase the scope of the project so that the anticipated income from the additional twenty-four rental units would appear to support the projected expenses. The East St. Louis Financial Advisory Authority ("FAA") questioned how Rosen could

increase the scope of the project without increasing the construction expenses. Rosen told the FAA that construction costs had fallen so significantly, due to the recent economic downturn, that it allowed him to add twenty-four more units to the project with no additional costs.

Of course Rosen could not actually build a fifty-six unit property for the same cost as a thirty-two unit property. In order to make up the difference, Rosen chose to substitute less expensive prefab modular housing units in place of the new construction that was contracted for in the development agreement—without notifying or receiving approval from the FAA, the East St. Louis Planning Commission, or the City Council. To prevent the FAA from discovering that he intended to substitute prefab modular housing, Rosen sent the FAA two facsimile transmissions misrepresenting his plans for the construction of the project. The first fax, dated June 16, 2009, contained an itemized list of materials and expenses related to the construction of the housing units. The list was created by the manufacturer of the prefab modular housing units. Rosen, however, removed the manufacturer's name, address, phone number, and fax number from the document to prevent the FAA from discovering that he planned to substitute prefab modular housing. The second fax was sent on June 18, 2009, and outlined a construction timeline for the project. The timeline listed the anticipated completion date of each phase of the new construction, including framing exterior walls, plumbing, insulation, drywall, and painting. Of course none of these phases of construction would occur because the prefab modular housing is completely manufactured off-site and then shipped to the project's location.

### B. Scheme to Fraudulently Obtain Private Financing

The terms of the agreement between Rosen and the City required Rosen to obtain $3,699,240 in private funding toward the completion of the project. The FAA granted approval for the project subject to the condition that Rosen verify that Kully Construction actually obtained private financing through a commercial loan by submitting a copy of the closing documents. As neither Rosen nor Kully Construction were creditworthy, Rosen solicited his accounting firm to create false financial statements and tax returns to exaggerate his income and assets.

On November 10, 2009, Rosen faxed his newly-created fictitious 2006 tax return to Amerisource Funding, in support of his application for private financing of the project. The submitted tax return falsely stated that Rosen owned a separate business with gross sales of $2,014,019, had an ordinary business income of $272,572, and total assets of $898,991. On November 20, 2009, Rosen again had his accountant send to Amerisource similarly false and fraudulent financial statements, balance statements, and statements of retained earnings for tax years 2006 and 2007.

Rosen then supplied the City with a series of letters that purported to verify that Kully Construction had obtained private financing for the developer's contribution to the Project. The FAA accepted a "commitment letter" from MDE Capital as verification of private financing so that construction could begin on the project. On June 23, 2009, the FAA passed FAA Resolution No. 09–0623–89, which granted an approval for the project, subject to the condition that Rosen actually

close a commercial loan and provide proof of the loan closing to the FAA. In reality, Rosen had not obtained a commitment to lend from MDE Capital, as he had represented; rather, MDE Capital refused to do business with Rosen after he requested that a representative provide him with a fraudulent closing document. Even without private financing, however, Rosen moved ahead on the development of the project, and began incurring costs, including the purchasing and clearing of the land on the proposed construction site.

Meanwhile, as Rosen was still representing to the City that he had obtained private financing through MDE Capital, he continued to secretly, and unsuccessfully, seek private financing through other financial institutions. When the FAA tried to confirm that Rosen had actually closed the commercial loan with MDE Capital, Rosen responded by supplying the FAA with closing documents from a different lender, First Monetary Group, Inc. The documents represented that Rosen had fulfilled his obligation and falsely evidenced the existence of a $3,699,240 line of credit.

Unbeknownst to the City and the FAA, First Monetary Group is not a financial lender; rather it is a brokerage service that matches potential borrowers to actual lenders. Rosen paid First Monetary Group $30,000 to create a closing document that would satisfy the FAA's requirements. In truth, no loan was closed, no line of credit was established, and no private funds were available to Rosen.

### C. Fraudulent Reimbursement

The next phase of Rosen's scheme occurred when he duped the City into reimbursing him for construction costs with public funds. According to the terms of the development agreement, public funds were to be used to reimburse eligible expenses that were actually paid by the developer. The development agreement required evidence in support of each request for reimbursement (e.g., bills, contracts, invoices, lien waivers) to verify that each expense was legitimate and eligible for reimbursement.

On September 11, 2009, Rosen submitted a request for reimbursement that falsely asserted that Kully Construction had paid each of the itemized expenditures listed on the invoice. Among the itemized expenses listed was a $40,000 expenditure supposedly paid to a subcontractor for clearing the land on the construction site. In reality, Rosen paid only $3,000 to clear the acreage. Rosen then forged the signature of the subcontractor on a lien waiver, which was submitted to falsely corroborate that the subcontractor had been paid in full, when in truth the subcontractor had performed the work but was still owed payment. After reviewing the documentation Rosen submitted with the reimbursement request, the FAA determined there was no evidence to support Kully Construction's claim that it had actually paid the subcontractor $40,000, and the FAA refused to reimburse that expense.

In total, Rosen made three "draw requests" for reimbursement of expenses incurred by Kully Construction—$47,036.15, $60,449.04, and $21,000. Rosen was actually reimbursed $66,449.04 by the City.

### D. The Investigation

In December 2009, a search warrant was executed for Rosen's home. During the investigation Rosen was interviewed three times by federal agents, over the course of which he admitted to forging a lien waiver, submitting falsified billing invoices and lying to investigators.

In September 2010, Rosen, now fully aware that he was the subject of a federal criminal investigation, met with an aspiring developer named Cheryl Pratt. Rosen told Pratt he was retiring due to health concerns and that the City was looking for a new developer to take over his project. Rosen, however, did not mention that the project was the subject of a federal criminal investigation. Rosen further told Pratt that $1.9 million dollars in public financing would be transferred to her and that she would be taking over a "fully functional, fully feasible project" that was "ready to go."

Relying on these misrepresentations, Pratt agreed to pay Rosen $100,000 to acquire the land, architectural plans, engineering plans, construction plans, and environmental studies. Pratt gave Rosen an initial $6,000 in earnest money and scheduled a formal closing for October 14, 2010. Rosen failed to turn over the plans to Pratt at the closing, but she gave Rosen an additional $44,000, and withheld the remaining $50,000 until he provided her with the missing documentation.

On October 22, 2010, Rosen dropped off a box of documents to Pratt's office and she issued a check to Rosen for the remaining $50,000. Pratt reviewed the documents, however, and learned that Rosen intended to substitute prefab modular housing in lieu of the on-site construction that was

required under the terms of the contract. Pratt also discovered that the City had not passed the ordinance transferring the $1.9 million dollars in public funding from Rosen to her. Shortly after, Pratt received a call from Rosen's engineering firm informing her that Rosen did not have authority to use or transfer the engineering plans because he had not yet paid the engineering firm. Pratt then contacted her bank and stopped payment on her $50,000 check before it was cashed.

During the fall of 2010, Pratt had several meetings with city officials to try to resolve the issues surrounding the project. In December 2010, Pratt was informed, for the first time, that the project was subject to a federal criminal investigation, and that Rosen did not actually own all the land at the site; one parcel was still owned by another individual and a second parcel was under the control of a Bankruptcy Trustee. Pratt then called Rosen, in December 2010, and told him she wanted to rescind their deal and have her initial $50,000 payment refunded. Rosen agreed. Predictably, however, no refund was ever remitted. Pratt attempted to contact Rosen approximately twenty times in the following months, but to no avail.

Pratt did not hear from Rosen again until May 2011, when she received a demand letter threatening to sue her if she did not pay Rosen the second $50,000 installment payment that she had cancelled. Eventually, Rosen filed a civil suit against Pratt.

### E.  Proceedings Below

On January 21, 2011, a grand jury in the Southern District of Illinois returned an indictment charging Rosen with nine counts of wire fraud. On October 2, 2011, Rosen pleaded guilty to counts one through seven of the indictment. In Rosen's plea agreement, the Government calculated his total offense level at twenty-seven, based on an offense level of seven, a sixteen level enhancement for the loss amount, and a four-level increase based on Rosen's role as an organizer or leader of the charged offenses. Rosen, on the other hand, calculated his offense level at seventeen, starting with a base offense level of seven and a ten-level enhancement for the loss amount.

Rosen was sentenced on April 20, 2012. The parties argued three primary issues at the sentencing hearing. First, Rosen objected to the probation officer's calculation of the intended loss. Second, Rosen objected to the application of a role-in-the-offense adjustment for being a leader or organizer of criminal activity that involved five or more participants or was other-wise extensive, pursuant to U.S.S.G. § 3B1.1(a).Third, the parties differed on what constituted a reasonable sentence in this case under the § 3553(a) factors.

Ultimately, the district court calculated that under a technical application of the law, the intended loss figure in this case was approximately $4.6 million dollars. However, the court granted Rosen's motion for a downward departure after determining that a technical application of the Guidelines would substantially overstate the offense. The district court calculated the intended loss amount to be $1,924,810—the amount of public funding that Rosen was approved to receive

from the City. Next, the district court determined Rosen to be an organizer or leader of criminal activity that involved five or more participants and applied an additional four-level enhancement.

The district court's resolution of these issues resulted in the calculation of a total offense level of twenty-four, which called for a Guidelines range of fifty-one to sixty-three months' imprisonment. The district court granted Rosen's request for a below-Guidelines sentence, though not to the full extent he sought. Rosen argued for leniency based upon his age, medical condition, family circumstances, and that the actual loss in this case was substantially less than the intended loss. In the end, the district court sentenced Rosen to a below-Guidelines range sentence of forty-eight months' imprisonment.

## II. DISCUSSION

Rosen appeals the district court's calculation of the intended loss amount under U.S.S.G. § 2B1.1, the determination of Rosen's role in the offense as a leader or organizer, pursuant to U.S.S.G. § 3B1.1(a), and the reasonableness of his sentence under U.S.S.G. § 3553(a).

### A. Intended Loss Calculation

We review a district court's calculation of loss for clear error. *United States v. Green*, 648 F.3d 569, 583 (7th Cir. 2011). However, threshold questions concerning the meaning of "loss" and the methodology to be used in measuring that loss present questions of law that call for *de novo* review. *United States v. Wasz*, 450 F.3d 720, 726 (7th Cir. 2006). The Sentencing Guidelines provide for an increase in offense level based upon

the amount of loss resulting from the offense. U.S.S.G. § 2B1.1(b). A loss is defined as either the actual or intended loss, whichever is greater. § 2B1.1, cmt. n.3 (A). Further, "intended loss" refers to the pecuniary harm that was intended to result from the offense, including that which would have been impossible or unlikely to occur. § 2B1.1, cmt. n.3 (A)(i-ii) (2011).

In determining the loss amount in this case, the district court found that the intended loss was $1,924,810, which was the amount of public funding the City earmarked for Rosen's affordable housing project. Rosen argues using the amount of public funding as the intended loss amount was an error that expands the Guidelines' definition of "intended loss" because it requires a presumption that he would have taken additional affirmative steps in furtherance of the fraud. In support of this claim, Rosen points out that he was never actually eligible to receive any public funds because he did not meet the condition of his agreement with the City that he obtain private financing. Rosen argues that the "intended loss" amount set by the district court is based on speculation as to the harm the defendant might have caused had his scheme persisted to its intended conclusion.

We disagree that the calculated intended loss amount was based on speculation. Rather it was based upon the amount Rosen was eligible to receive from the City had his scheme been successful. As we noted in *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991), "'loss' within the meaning of the Guidelines includes intended, probable, or otherwise expected loss, a qualification of vital importance in a case … where fraud is discovered or otherwise interrupted before the victim

has been fleeced." Rosen qualifies as a "true con artist." *Id.* He had no intention of upholding his end of the agreement with the City, and clearly had no qualms about doing whatever he deemed necessary in order to carry out his fraudulent scheme to its most lucrative end. Accordingly, we find that the district court did not err in its determination of the appropriate intended loss amount.

### B.  Role-In-The-Crime Enhancement

The district court applied a four-level enhancement to Rosen's sentence, pursuant to U.S.S.G. § 3B1.1(a), after determining that Rosen was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Whether a defendant exercised a leadership or managerial role in the charged offense is a determination that we review for clear error. *United States v. Johnson*, 489 F.3d 794, 796 (7th Cir. 2007).

The "central concern" of § 3B1.1 is the defendant's relative responsibility for the commission of the offense. *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012) (citing *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009)). In making that determination, the district court should consider factors such as "the defendant's decision-making authority, nature of participation, recruitment of accomplices, claimed right to a larger share of the fruits of the crime, role in planning and organizing, scope of illegal activity, and control and authority exercised over others." *Vasquez*, 673 F.3d at 685 (citing U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010)). In order to appropriately apply a § 3B1.1(a) adjustment to a defendant's sentence, "the defendant must

have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." *Vasquez*, 673 F.3d at 685 (citing *Knox*, 624 F. 3d at 874).

Even though the record clearly reflects that Rosen was the sole mastermind behind this scheme, and recruited additional accomplices as he deemed necessary, he argues that this enhancement was in error as he was not the organizer of a unified criminal plot. Rosen admits he had "associations" with people he used to further his criminal conduct, however, he argues that those associates' roles were too limited in scope and objective for them to be considered participants in a larger, cohesive criminal scheme. The Presentence Report identified seven individuals who participated in Rosen's scheme. Rosen concedes he recruited each of these individuals, but he argues that he solicited each person only as his need for their individual services arose. Meaning each individual was solicited by Rosen for a specific objective rather than all acting in concert within a larger unitary criminal scheme, and he did not exercise authority or control over the participants.

Relying on *United States v. Wasz* 450 F.3d 720 (7th Cir. 2006), the district court found that Rosen's organizational role consisted of "efforts to marshal other individuals for the purpose of executing the crime" thereby satisfying § 3B1.1(a). *Id*. at 730. Rosen argues his case is distinguishable from *Wasz* because here there was no unified scheme; rather each participant was recruited by Rosen to perform a specific role (such as creating a fictitious tax return) and there is insufficient evidence to suggest that all these participants were working

towards the same end. We disagree. In *Wasz*, we noted that though the defendants contracted individually with each co-defendant, their actions still reflected "a guiding influence over the other participants in the offense." *Id*.

Here, we agree with Rosen that he recruited each additional participant to perform specific illegal handiwork, but that does not diminish his culpability as an organizer under § 3B1.1(a). Rosen alone owned Kully Construction, the "development" business at the center of this fraud scheme, and he alone had decision-making control over every aspect of this crime. Rosen chose who was recruited, for what purpose, and solely determined each participant's appropriate compensation. For example, Hawkins was a secretary Rosen solicited to pose as Kully's fictional CEO. In exchange, Rosen promised her future employment in the company. It is clear that Rosen was in control of this ploy all along. He recruited and compensated his cohorts as needed to bring his fraudulent plan to its intended conclusion. We find no clear error in the the district court's determination that Rosen was the organizer of this brazen scheme and deserving of a four-level enhancement pursuant to § 3B1.1.(a).

### C.  Unreasonable Sentence

Rosen's final challenge is to the reasonableness of his sentence. When considering the overall reasonableness of a sentence, we review for an abuse of discretion. *United States v. Jackson*, 547 F.3d 786, 792 (7th Cir. 2008). This review involves a two-step analysis. First, we ensure that the district court did not make any procedural errors; if it did not, then we evaluate the sentence's substantive reasonableness. *Id.* Here, Rosen faces

a particularly uphill battle, given that his sentence is presumptively reasonable because it is below the applicable Guidelines range. *See United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009).

### 1.  Sentencing Procedures

The Supreme Court has made clear that a, "a district court should begin a sentencing hearing by calculating the advisory guidelines range." *United States v. Long*, 639 F.3d 293, 299 (7th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). The district court must then subject its proposed sentence to adversarial testing, hearing arguments as to whether the advisory sentence should apply. *Long*, 639 F.3d at 299 (citing *Rita v. United States*, 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)). Finally, the district court must evaluate the § 3553(a) factors and impose a sentence, providing an "adequate statement of the judge's reasons, consistent with § 3553(a), for thinking the sentence that he has selected is indeed appropriate for the particular defendant." *Long*, 639 F.3d at 299 (citing *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005)).

Here, the crux of Rosen's argument is that the procedural sequence of his sentencing hearing was improper because the district court failed to adhere to the "strict" sentencing procedures outlined in U.S.S.G. § 1B1.1. Specifically, Rosen argues the district court erred when it made the determination that he was entitled to a downward departure regarding the intended loss amount at issue contemporaneously with its determination of the applicable Guidelines range. In support of his contention, Rosen relies upon a case in which the Third Circuit,

held that the district court procedurally erred when it analyzed steps of the sentencing procedures out of order. *United States v. Friedman*, 658 F.3d 342, 361 (3d Cir. 2011). In *Friedman*, the district court began its analysis by first discussing the disputed loss calculation, then discussing a departure motion, then discussing two additional Guidelines disputes, then engaging in some discussion of the § 3553(a) factors, then stating that it would impose something less than a offense level of twenty-two before continuing its discussion of § 3553(a) factors. *Id*. Finally the district court imposed a thirty-four month sentence, based on an offense level of "either nineteen or twenty." *Id.* Our sister circuit reasoned that the convoluted record in *Friedman* inhibited its "ability to review the sentence for reasonableness and thus required remand." *Id.*

That situation is not present here. A review of the sentencing transcript shows that the district court correctly calculated the appropriate Guidelines range, granted a sufficient downward departure based upon the intended loss amount in this case, sufficiently considered the arguments of both Rosen and the Government, and crafted a reasonable sentence based upon the § 3553 (a) factors. Unlike *Friedman*, we have no trouble reviewing the district court's sentence in this case and find no procedural error.

### 2. Substantive Reasonableness

Rosen raises two challenges to the substantive reasonableness of his sentence. First, Rosen argues that his sentence is unreasonable because the intended loss amount calculated by the district court overstates the seriousness of his offense, when compared to the actual loss that occurred. The commen-

tary to U.S.S.G. § 2B1.1 notes that "there may be cases in which the offense level determined under this Guidelines substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. n. 19(C).

In this case, the district court calculated the intended loss amount at $1.9 million dollars—the amount of public funding that Rosen stood to receive had his scheme progressed as he hoped. Rosen argues that in order to even be eligible to receive the $1.9 million dollars in public funding, he would need to first obtain private financing, and then submit draw requests to the City asking for reimbursement. Since Rosen was unsuccessful, after multiple attempts, to obtain private financing, he argues that the $1.9 million dollar loss amount set by the court is unreasonably high because there was little possibility that Rosen's scheme could have successfully progressed to that point. Rosen argues that his ploy was doomed never to materialize beyond fraudulent private financing applications; the actual loss amount ($66,449.04) is a more accurate barometer of the seriousness of his offense.

We have held that a "court can consider the amount of variance between the intended loss and the realistic possibility of loss when considering an appropriate sentence." *United States v. Portman*, 599 F.3d 633, 640 (7th Cir. 2012) (citing *United States v. Stockheimer*, 157 F.3d 1082, 1091 (7th Cir. 1998)). This decision, however, remains in the sentencing judge's wide discretion, and our review may only evaluate the overall reasonableness of the sentence imposed. *Id*. A review of the record demonstrates that the district court thoroughly considered the substantial difference between the intended loss in this case ($1.9 million dollar) and the actual loss amount

($66,449.04); when the district court granted Rosen a below Guidelines sentence, which we hold to be presumptively reasonable. *See Rita v. United States*, 551 U.S. 338, 347, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). Therefore, we find no abuse of discretion, nor any support for Rosen's contention that his sentence is unreasonable because the intended loss amount overstates the seriousness of his offense.

Second, Rosen contends that the court failed to adequately consider the mitigating factors applicable under § 3553(a). We will determine a sentence to be reasonable "if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines, and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008) (citing *Gall*, 552 U.S. at 49–50, 128 S.Ct. 586; *United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007)).

Here, Rosen contends that the district court did not give proper weight to his family circumstances, advanced age, and poor health. On the contrary, the sentencing transcript in this case illustrates that the district court throughly considered all appropriate § 3553(a) factors in crafting Rosen's sentence. The district court specifically noted Rosen's advanced age and failing health, but also saw his crime as outrageous. Rosen sought to swindle an already impoverished City out of millions of dollars in public funding through an elaborate fraud scheme, couched under the guise of creating "affordable housing" for the benefit of the residents of East St. Louis. Rosen failed to rebut the presumption of reasonableness

attached to his sentence, as such, we find no abuse of discretion.

### III.  CONCLUSION

Accordingly, we AFFIRM.